# DEFENDANT'S EXHIBIT

# A



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JM:EJK:DCP
                                *271 Cadman Plaza East*
                                *Brooklyn, New York 11201*

June 9, 2014

<u>By First Class Mail</u>

Peter Kirchheimer, Esq.
Attorney-in-Charge
Federal Defenders of New York
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

          Re:    <u>Inmate Emails On TRULINCS</u>

Dear Counsel:

          The United States Attorney's Office for the Eastern District of New York (the "Office") writes to apprise you of this Office's policy regarding emails sent by inmates at the Metropolitan Detention Center (the "MDC") to their attorneys using the Bureau of Prisons' ("BOP") Trust Fund Limited Inmate Computer System ("TRULINCS"). As you may know, this Office routinely obtains inmates' TRULINCS emails, including those that may have been exchanged between inmates and their attorneys. For the reasons set forth below, emails exchanged between inmates and their attorneys using the TRULINCS system are not privileged, and inmates have other means to communicate with their attorneys in a privileged setting. Accordingly, this Office intends to review all email obtained from the TRULINCS system.

      I.     <u>Legal Standard</u>

          "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." <u>United States v. Mejia</u>, 655 F.3d 126, 133 (2d Cir. 2011) (citing <u>In re County of Erie</u>, 473 F.3d 413, 419 (2d Cir. 2007)). With regard to the second prong, the Second Circuit has previously held in an analogous context that an inmate's communication over a telephone that the inmate knows is being recorded by prison authorities is not protected by the attorney-client privilege. <u>See Mejia</u>, 655 F.3d at 133 ("We agree with the district court that, on the basis of the undisputed fact that [defendant] Rodriguez was aware that his conversation was being recorded by BOP, Rodriguez's disclosure to his sister of his desire to engage in plea discussions with his attorney was not made in confidence and thus constituted a waiver of the privilege.").

Mejia was a decision of first impression in the Second Circuit, but it is in line with other circuits that have considered the issue. Those circuits have similarly held that when an inmate is aware that his calls are being recorded, those calls are not protected by a privilege. See United States v. Hatcher, 323 F.3d 666, 674 (8th Cir. 2003) ("The presence of the prison recording device destroyed the attorney-client privilege. Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the presence of a third party."); United States v. Madoch, 149 F.3d 596, 602 (7th Cir. 1998) (holding that marital privilege did not apply when spouse seeking to invoke the privilege knew that the other spouse was incarcerated); see also United States v. Pelullo, 5 F. Supp. 2d 285, 289 (D.N.J. 1998) ("[T]o the extent that defendant engaged in telephone conversations with attorneys on the monitored line the communications were not privileged. Defendant had no expectation of privacy in these conversations. They were knowingly made in the presence of the Bureau of Prisons through its taping and monitoring procedures. This constitutes a waiver of any privilege that might otherwise have existed."); United States v. Lentz, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) ("an inmate's telephone conversations with counsel are not protected by the attorney-client privilege where, as here, the inmate is notified at the outset that the calls are recorded and subject to monitoring").

In order to waive the privilege, the inmate must have notice that his or her calls are being monitored. After receiving that notice, however, an inmate who communicates with his or her attorney over the monitored telephone has waived the attorney-client privilege by "voluntarily disclosing otherwise privileged information to a third party." Lentz, 418 F. Supp. 2d at 827. This is particularly true when there are other ways for the inmate to communicate with his or her attorney in a privileged setting, but the inmate chooses not to do so. See Mejia, 655 F.3d at 133 (noting defendant's failure to use options offered by the BOP that preserve confidentiality).

II. Inmates and Attorneys Are Provided Express Notice
    that Emails on the TRULINCS System are Monitored

As set forth below, inmates at the MDC and their counsel are provided with ample notice that their emails are being monitored. Thus, no attorney-client privilege attaches to such communications.

Prior to gaining access to TRULINCS, an inmate must consent to the monitoring of all emails placed using TRULINCS. In order to gain access to TRULINCS, each inmate must execute the "Inmate Agreement for Participation in TRULINCS Electronic Messaging Program." That one-page agreement includes seven separate conditions of participation. One of those conditions is the "Consent to Monitoring" condition, which provides in relevant part:

> I am notified of, acknowledge and voluntarily consent to having my
> messages and transactional data (incoming and outgoing) monitored,
> read, retained by Bureau staff and otherwise handled as described in

2

[BOP directives]. **I am notified of, acknowledge and voluntarily consent that this provision applies to messages both to and from my attorney or other legal representative, and that such messages will not be treated as privileged communications**.

(emphasis added). The BOP retains, and is able to access, the Inmate Agreement for each inmate at the MDC.

Moreover, each time an inmate logs onto TRULINCS, the system generates a message to the inmate with the following warning:

> The Department may monitor any activity on the system and search and retrieve any information stored within the system. By accessing and using this computer, I am consenting to such monitoring and information retrieval for law enforcement and other purposes. I have no expectation of privacy as to any communication on or information stored with the system.

Further down the page, the same warning banner states:

> I understand and consent to having my electronic messages and system activity monitored, read, and retained by authorized personnel. **I understand and consent that this provision applies to electronic messages both to and from my attorney or other legal representative, and that such electronic messages will not be treated as privileged communications, and I have alternative methods of conducting privileged legal communication**.

(emphasis added). In order to continue using the system and access their email, the inmate must click "I accept."

Similarly, non-inmate users of TRULINCS, including attorneys, are provided with notice that all communications on the system are monitored. In order to use TRULINCS, non-inmate users must be added to an inmate's "contact list." Once the inmate adds someone to his or her contact list, the TRULINCS system sends a generated message to the proposed contact's email address. That generated email states, inter alia, "[b]y approving electronic correspondence with federal prisoners you consent to have the Bureau of Prison staff monitor the content of all electronic messages exchanged." The message is written in both English and Spanish. The recipient of the email is then directed to a website where he or she must insert a specific code in order to be given access to TRULINCS.[1]

---

[1] In addition, BOP's TRULINCS Program Statement 5265.13 specifically states that "special mail" recipients or other legal representatives on an inmate's contact list may be added to the TRULINCS system, with the acknowledgment that electronic messages

Finally, the American Bar Association ("ABA") has acknowledged that the communications between inmates and their attorneys on TRULINCS are not privileged. In February 2006, when TRULINCS was undergoing a limited initial rollout, the ABA's Governmental Affairs Office submitted a letter to Harley Lappin, the Director of the BOP. In that letter, the ABA urged the BOP to make permanent and extend the TRULINCS program, which was then being tested at several federal correctional institutions. In its letter, the ABA acknowledged that the TRULINCS system would be monitored by the BOP and stated that TRULINCS emails are utilized for unprivileged communications:

> Although presenting confidentiality concerns, TRULINCS greatly enhances the attorney-client relationship by supplementing unmonitored forms of communication, that is legal mail, legal calls and professional visiting. It affords attorneys and their incarcerated clients the possibility of making expedited contact when quick decisions must be made or non-privileged information relayed. . . . TRULINCS also eases the burden on institution staff by relieving them of the responsibility of coordinating visits or calls for what are otherwise administrative, though time-sensitive, matters.

(emphasis added) .

III.  Inmates Have Adequate Alternative Means to
      Communicate in Unmonitored Settings

The MDC's policy of monitoring all email on TRULINCS comports with the suggestion in the case law that an inmate must have the means to communicate with his or her attorney in an unmonitored setting. The MDC specifically provides multiple methods for an inmate to do so: (i) unmonitored, in-person visits; (ii) unmonitored telephone calls, which must be approved by a staff member; and (iii) "Special Mail" correspondence, which can only be opened in the presence of an inmate.

---

exchanged with individuals will not be treated as privileged communications and will be subject to monitoring.

IV.   Conclusion

        For the above reasons, emails between inmates and their attorneys sent over the TRULINCS system are not privileged, and thus the Office intends to review all emails obtained from the TRULINCS system.

        Please let me know if you would like to discuss this issue or have any questions.

        Very truly yours,

        LORETTA E. LYNCH
        United States Attorney

By:        _____

        James G. McGovern
        Assistant U.S. Attorney
        Chief, Criminal Division
        (718) 254-6293

cc:    The Honorable Carol B. Amon, Chief Judge, Eastern District of New York
       The Honorable Cheryl L. Pollak, Chair, Eastern District Criminal Justice Act Panel
       Committee

# DEFENDANT'S EXHIBIT

# B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,            : 14-CR-00277(DLI)
                                     :
                                     :
                                     :
                                     : United States Courthouse
          -against-                  : Brooklyn, New York
                                     :
                                     :
                                     : Friday, June 27, 2014
SYED IMRAN AHMED,                    : 2:32 p.m.
                                     :
          Defendant.                 :
                                     :
                                     :
                                     :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE DORA L. IRIZARRY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
               BY:  F. TURNER BUFORD, ESQ.
                    ERIN ARGO, ESQ.
                    Assistant United States Attorney

For the Defendant:  WILSON SONSINI GOODRICH & ROSATI, PC
                    1301 Avenue of the Americas
                    40th Floor
                    New York, New York 10019
               BY:  MORRIS J. FODEMAN, ESQ.
                    CATHERINE S. GREALIS, ESQ.

Court Reporter:     SHERRY J. BRYANT, RMR, CRR
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    sbryant102@verizon.net

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

PROCEEDINGS                                        2

1         (In open court.)

2         COURTROOM DEPUTY:  Criminal cause for status

3  conference, Docket Number 14-CR-277, the United States versus

4  Syed Ahmed.  Please state your appearances.

5         MR. BUFORD:  Good afternoon, Your Honor.  It's

6  Turner Buford for the United States.  Here with me at counsel

7  table is Assistant U.S. Attorney Erin Argo.

8         THE COURT:  Good afternoon to both of you.  For the

9  defendant.

10        MR. FODEMAN:  Good afternoon, Judge.  Morris Fodeman

11 and Catherine Grealis from Wilson Sonsini Goodrich & Rosati

12 for Defendant Syed Ahmed, who, as I'm sure you're aware, is

13 not before the Court.

14        THE COURT:  Yes.

15        MR. FODEMAN:  We're prepared to address that.

16        THE COURT:  Yes.  I had asked my deputy to see if

17 she could find out anything from the marshals, and the only

18 thing that we were able to -- the only other information we

19 were able to get is that he said that he was sick.

20        Now, I'm going to ask the government, please, to

21 look into that and see whether if he was, in fact, sick if he

22 had been seen.  I'd also like to know if he is sick what the

23 prospects are of him getting better because, obviously, we

24 need to know if he's going to be able to make any further

25 court appearances anytime soon.  So if you could find that out

PROCEEDINGS                                          3

1    and perhaps by next Tuesday.  I guess that's July 1st.

2           MR. FODEMAN:  Judge, we have some additional

3    information in that regard, if you'd like.

4           THE COURT:  Yes.

5           MR. FODEMAN:  Notwithstanding my urging to Dr. Ahmed

6    not to use the e-mail system until we resolve today's issue,

7    both Ms. Grealis and I received e-mails this morning after

8    learning that he would not be produced; and essentially, he

9    confirmed that he was up all night with a gastro -- what

10   sounds like a gastrointestinal issue.

11          He asked us to convey his apologies to the Court and

12   to the government counsel.  And it didn't sound like, from the

13   brief e-mail -- I urged him to keep it brief -- but it didn't

14   sound like it was going to be an ongoing issue.  It sounded

15   like he had eaten something.

16          I can tell you that we had seen Dr. Ahmed earlier in

17   the week at the facility and he was eagerly anticipating

18   today's appearance.  So I don't think this is a situation

19   where he's -- like some defendants, maybe there's game playing

20   going on.  We were eager to spend time with him in the pens

21   this morning and he was eager to be here for today's

22   appearance.  So I'm hopeful and expecting that he'll be at any

23   future court hearing.

24          THE COURT:  Okay.  Well, my reason for asking the

25   government to look into it is twofold, because, again, while

PROCEEDINGS                                         4

1   we have a new warden who is overseeing the MDC, we do have

2   these continuing -- these ongoing issues about defendants

3   claiming that they are not seen when they're requesting to be

4   seen.  So I also want to make sure that if, in fact, he is ill

5   that he, in fact, is being seen by medical staff at the MDC,

6   so that there's a dual reason for that.  We have not heard

7   that there's any kind of outbreak of anything, but, again,

8   somebody can get sick at any given time.

9          Since you do tell me, Mr. Fodeman, that your client

10  was eagerly awaiting his opportunity to appear here today -- I

11  know that we've got some important issues to discuss in

12  connection with the TRULINCS -- is this something that he

13  wanted to be present for or can we waive his appearance for

14  this?

15         MR. FODEMAN:  I'm prepared to waive his appearance,

16  Judge.  When I say he was eager, I think he was -- I say that

17  by meaning he was interested in the issues that were going to

18  be talked about today, but he certainly didn't suggest in his

19  communication with me today that he was expecting things would

20  not move forward.  So, based on that, I'm comfortable moving

21  forward if Your Honor is and the government.

22         THE COURT:  Okay, because I don't -- this is an

23  important issue and I really did not want to sit on it and I

24  wanted to address it as quickly as we could.  So, since you

25  are waiving your client's appearance, we'll proceed on this.

PROCEEDINGS                                          5

1    This is really a purely legal issue in any event, just so that

2    we're clear on the record.

3            I've read the submissions that the parties have

4    made:  The government's letter of June 16, which is docket

5    entry 35; defense counsel's submission and response, docket

6    entry number 38, and there are some attachments to that; and

7    the government's response dated June 26, which is document

8    number 39.

9            Let me state at the outset that I don't think what's

10   critical here is really whether under the law the TRULINCS

11   communication or Corrilinks -- apparently, that's how it sort

12   of -- however it gets translated when it gets to defense

13   counsel, as I understand from other CJA counsel.  I am on the

14   CJA committee and the CJA committee is looking into this

15   issue.  It is somehow translated into Corrilinks.

16   C-o-r-r-i-l-i-n-k-s I think is how it's spelled.  But we're

17   talking about the same system.  Whether it's Corrilinks or

18   it's TRULINCS, it's the same e-mail system.

19           There are certainly admonitions or warnings that

20   communications over that system are not privileged.  I myself

21   make it a point to go as often as I can to the MDC and take a

22   look at the entire facility and have seen this e-mail system

23   myself and have seen demonstrations of it.  But that's not

24   really what's at the heart of the issue here.

25           And what is disturbing to the Court is that all of a

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                                                    6

1    sudden now, in June of 2014 -- and I guess the system has been

2    in place since about 2006 so it's been around for about eight

3    years -- that the government is only now saying, oh, and by

4    the way, we're going to just do across-the-board examination

5    of attorney-client e-mails and any other e-mails that the

6    inmate sends over TRULINCS.

7            So I suppose -- I have a series of questions.  My

8    first question is, why now?  Or if the government has been

9    doing this all along, why admit to it now?

10           MR. BUFORD:  Your Honor, I think the government's

11   position with respect to whether the communications over the

12   TRULINCS system are privileged or not has been consistent from

13   the outset, and that is that the communications are not

14   privileged, in keeping with the --

15           THE COURT:  That's not the issue.  My question is a

16   very pointed one.  Why are you looking at these e-mails now?

17   Because the fact that Mr. McGovern sent out this letter to the

18   attorney in charge of the Federal Defenders, understanding

19   that he would be the vehicle through which then the rest of

20   the Federal Defenders and I'm including in there the CJA

21   attorneys and ultimately the private federal criminal bar

22   would become aware of it, it was -- and I read that letter and

23   it's a very pointed letter that says:  Be advised that we are

24   now looking and intend prospectively to be reading all of

25   these e-mails.  And it's across the board.  It's not just on

PROCEEDINGS                                          7

1   this case.  It's not -- it's just an across-the-board
2   intention of doing this.  Why now?
3           MR. BUFORD:  Your Honor, I don't understand
4   Mr. McGovern's letter as announcing an intention to read the
5   e-mails in every case.  And certainly, in this particular
6   case, the government has no great interest in reading e-mails
7   between --
8           THE COURT:  That's not what the letter says.  The
9   letter says that we will be -- moving forward, we will be
10  reading these e-mails.
11          MR. BUFORD:  I understood the letter as reserving
12  the right on the part of the government to read the e-mails,
13  but not necessarily an announcing of a blanket intention to
14  actively read the e-mails in all cases.  I could be
15  misremembering the letter, Your Honor.
16          THE COURT:  Why now?  I haven't heard an answer to a
17  very pointed question.
18          MR. BUFORD:  As to why the office chose now to send
19  that particular letter, I don't know that I have the policy
20  rationale behind it.  My understanding, though, is that it was
21  not intended to announce any sort of change in policy.
22          THE COURT:  I'm going to read.  I have
23  Mr. McGovern's letter dated June 9th, and it reads, it
24  explains:  "For the reasons set forth below" -- I'm reading
25  from the letter -- "e-mails exchanged between inmates and

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                                    8

1   their attorneys using the TRULINCS system are not privileged

2   and inmates have other means to communicate with their

3   attorneys in a privileged setting.  Accordingly, this office

4   intends to review all e-mail obtained from the TRULINCS

5   system."

6           That is not on a case-by-case basis, if we feel like

7   it, if we have some reason to do this.  It's an

8   across-the-board this is what we're doing, we're reading all

9   the e-mails.

10          MR. BUFORD:  Your Honor, my --

11          THE COURT:  And what I gather from seeing a letter

12  like this is that apparently that wasn't the case before,

13  unless the U.S. Attorney's Office has been doing this before

14  and just never admitted to it.

15          MR. BUFORD:  I don't know about specific prior

16  cases, Your Honor.  It's my understanding that the policy of

17  the office has been always to reserve the right to obtain and

18  review the e-mails on the grounds that they're not privileged.

19  I didn't understand Mr. McGovern's letter as announcing a new

20  intention going forward proactively to obtain and review all

21  e-mails, although I recognize the language in the letter is

22  what it is.

23          It's my understanding from discussions internally at

24  the office that the point here was to, consistent with prior

25  policy, reserve the right, continue to reserve the right to

PROCEEDINGS                                          9

1    obtain non-privileged --

2              THE COURT:  This is not reserving the right.  This

3    is saying this office intends -- that is clear -- intends to

4    review all e-mail obtained from the TRULINCS system.

5              MR. BUFORD:  My understanding is that the government

6    does not necessarily intend as a blanket policy to obtain the

7    e-mail from the TRULINCS system in all cases.  Rather, the

8    government intends to reserve its right to do so in particular

9    cases.  And to the extent the letter --

10             THE COURT:  But that's not even what you say in your

11   letter, because in your letter you indicate that while you are

12   agreeing not to read any of the attorney-client e-mails in

13   this case that were sent prior to the date of your letter,

14   which is June 16, but that you intend to do it moving forward.

15             MR. BUFORD:  Let me say this, Your Honor:  I think

16   in the past, especially I think more in the context of phone

17   calls, the office has made certain accommodations in

18   conjunction with the BOP and the MDC as far as whether or not

19   to obtain phone calls between attorneys and their clients.

20             My understanding is that phone calls, unlike the

21   e-mail system, which I understand a little bit better having

22   spoken earlier today with someone at the BOP in the Counsel's

23   Office, the phone calls are easily segregated in terms of you

24   can tell from which numbers the calls are being made and you

25   can see that on an index prior to opening --

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                                        10

1          THE COURT:  Oh, give me a break.  Give me a break.

2    You're going to tell me so you can see the phone number, but

3    you can't see the e-mail address that goes to Mr. Fodeman?

4          MR. BUFORD:  Your Honor, I spoke earlier today with

5    someone in the Counsel's Office at the BOP who confirmed my

6    understanding.  The way the TRULINCS system works is BOP

7    cannot segregate out e-mails to and from a particular address.

8          And, therefore, when you -- when an inmate's e-mail

9    is requested, the result from the system is a giant PDF

10   document, a single PDF that contains multiple e-mails.  And

11   they're not contained in the sense that they're a collection

12   of individual documents, it's one single PDF document that

13   reads almost like a scroll as you go through.  So that the

14   e-mail communications don't necessarily begin and end as the

15   pages begin and end.  So a particular e-mail exchange might

16   overlap with another e-mail exchange on the same page.

17         And so the heart of the government's concern is if

18   it were to undertake steps to prevent any attorney-client

19   e-mails from being seen by the prosecution team, in order to

20   do that with any confidence, you would have to put in place a

21   full formal taint review team that would go through the PDF

22   document and either delete the pages that contained

23   attorney-client communications or redact them in such a way as

24   to prevent the prosecution team from reviewing them.  And that

25   is an administrative burden that, as I understand --

PROCEEDINGS                                    11

1        THE COURT:  You still have not answered my question,

2   okay, because apparently your office prior to this had not

3   been making a point of reviewing all the e-mails, much less

4   all the attorney-client e-mails.  So why now?

5        MR. BUFORD:  I believe the policy before had been to

6   obtain e-mails in various cases, and I believe that the policy

7   now is to continue to obtain e-mails in various cases where

8   the government perceives a need to have them.  The problem for

9   the government is there's no easy way when you obtain e-mails

10  to screen out attorney-client e-mails.

11       THE COURT:  You know what, I'm not buying that.  We

12  are in the 21st century.  The technology that we have now is

13  incredible.  And even I, with my simple knowledge of computers

14  and e-mails, am aware that in G-mail, for example, if you have

15  a G-mail account, a G-mail user may very simply program the

16  G-mail account so that the e-mails that are coming from

17  Mr. Buford to me can automatically be put in a segregated

18  file.

19       And I find it very hard to believe that the

20  Department of Justice, with all of the resources that it has,

21  with the access to the Department of Homeland Security and

22  NSA, cannot come up with a simple program that segregates

23  identified e-mail addresses.  For example, Mr. Fodeman's

24  address, Ms. Grealis's address -- I hope I'm pronouncing it

25  right -- any paralegal in their office or any other person who

PROCEEDINGS                                            12

1    they believe to whom the attorney-client privilege will apply

2    in this particular case, and those e-mails are identified both

3    by the inmate and one of those addresses is identified and

4    programmed very simply to go into a separate folder.  And that

5    can be done mechanically, by a machine, where no human eyes

6    have to see this.

7              MR. BUFORD:  Your Honor, as to the capability of the

8    TRULINCS system itself, as administered by the BOP system, I

9    can only convey what's been conveyed to me by --

10             THE COURT:  What I'm telling you is that there's no

11   way, technologically speaking, that this system cannot be

12   adjusted and probably adjusted very simply, and I'd be willing

13   to bet that there are undergraduates at MIT who could do it

14   today, who could adjust the program to eliminate this

15   particular issue.

16             MR. BUFORD:  Your Honor, again, as to the

17   technological capabilities of the TRULINCS system, I can only

18   convey what's been conveyed to the office by the BOP, and that

19   is that the system cannot segregate out e-mails to and from a

20   particular address as differentiated from e-mails to and from

21   a different address.

22             THE COURT:  Let me ask you something.  Is this

23   TRULINCS, the administration of this TRULINCS system, is it

24   run by BOP or is it outsourced to a private company?

25             MR. BUFORD:  I believe it -- I don't know, Your

PROCEEDINGS                                    13

1    Honor.  I believe BOP is technically the administrator of the
2    program, but I don't know whether they contract with a service
3    provider to administer the service.

4           THE COURT:  Then I don't know what you mean by BOP
5    is technically the administrator if an outsourced company,
6    private company is the one actually maintaining and
7    administering the program.

8           MR. BUFORD:  Let me rephrase, Your Honor.  I believe
9    that BOP is the custodian of the program with responsibility
10   for overseeing it from the government's standpoint.  Whether
11   or not, in fulfilling that responsibility, they employ outside
12   vendors, that I don't know.

13          THE COURT:  Do you wish to be heard in connection
14   with this particular area we're talking about, Mr. Fodeman?

15          MR. FODEMAN:  I think Ms. Grealis, if it's all right
16   with Your Honor, would like to take the lead on this issue.

17          THE COURT:  Sure.  Just point the microphone towards
18   you so we can hear you.

19          MS. GREALIS:  Your Honor, I would just like to say
20   at the outset I think that we have the same reaction that this
21   Court has and other courts have had when faced with this
22   issue.  This is not the first time this has been litigated.

23          Judge Buchwald out of the Southern District of New
24   York, when she learned that the AUSA in that case had sent a
25   similar letter to the one that we received here to defense

PROCEEDINGS                                    14

1   counsel, her reaction was, and I quote:  "You don't have the

2   right to eavesdrop on an attorney-client meeting in prison or

3   out of prison and it seems to me that you don't have the right

4   to open up mail between counsel and an inmate or inmate and

5   counsel."

6           The Court went on to acknowledge that there may be

7   circumstances where if the attorney is engaging in nefarious

8   conduct with the inmate or a crime, the crime-fraud exception

9   would apply.  Barring that, she said, though:  "I don't see

10  why it should make a difference whether the mode of

11  communication is more modern or more traditional."

12          We feel that the same logic applies here.  The AUSAs

13  in that case reasonably agreed not to read the communications.

14  The Court didn't even have to rule on the issue because the

15  AUSA said, it's my practice not to read attorney-client e-mail

16  communications.  And we feel that the same circumstances

17  should apply here, even more so, because we -- Mr. Fodeman has

18  been appointed as CJA counsel.  As you know, I'm -- my

19  services are pro bono.

20          The burden on us, our defendant and the Court's

21  resources are at stake here when we're forced, instead of

22  being able to send a quick e-mail to our client, to have to go

23  down to the MDC to ask him a question about a case.

24          And to that point, you know, we're just asking that

25  the Court rule in the circumstances of this case, the

PROCEEDINGS                                          15

1   government not be able to read our communications with

2   Dr. Ahmed, because this is a very document-intensive case.

3   We've already received over 50,000 pages of documents from the

4   government.  I have with me here some of the patient records

5   and spreadsheets that I can show the Court.  This represents

6   just one patient, the records that we've seen thus far that we

7   need to sit down and review with our client and go through.

8           And if we have to go down to the MDC every time we

9   have a question about one of these documents, it's going to be

10  a tremendous waste of our time and of the Court's resources to

11  have to spend money for us to go down there for what would be

12  a quick easy e-mail that we could send instead.

13          In addition, more to that point, we visited Dr.

14  Ahmed for a second time this week and it took approximately

15  four hours of our time to get down there and back.  Now, as I

16  said before, my time is obviously free to the Court, but

17  that's about $500 of Mr. Fodeman's time and the CJA resources.

18          We, of course, recognize that in-person visits are

19  going to be important and that we will be making them

20  throughout the case and we are more than happy to do so, but

21  to not be able to avail ourselves of technological advances in

22  e-mail to easily save this Court's resources seems, frankly,

23  ridiculous.

24          Moreover, we recently have started reaching out to

25  potential experts and none of which are located in New York.

PROCEEDINGS                                     16

1   For them not to be able to e-mail with our client and review

2   documents via e-mail and have to fly out to New York to try

3   and make an in-person visit is just -- seems preposterous to

4   me.

5          And as for the other alternative methods that the

6   government proposed in their letter submissions to the Court,

7   I can attest -- I'm sure you saw we attached to our letter a

8   declaration by Mr. Geritano, our paralegal coordinator, who

9   has been unable to even learn how we could set up an

10  unmonitored phone call, let alone seek approval for one.

11         He -- I can attest that he has tried again this

12  week.  He still has not learned how to do so.  He has not been

13  able to even get in touch with Dr. Ahmed's inmate counselor.

14  And the idea that we can communicate by special mail

15  correspondence, which has a two-week lag time, seems

16  ridiculous.

17         I just feel, in the circumstances of this case where

18  we're appointed as CJA counsel and we have this very

19  document-intensive case, that the government's position is

20  outrageous and this Court should rule that they should not be

21  allowed to look at our attorney-client e-mails.

22         THE COURT:  I have one other question that I have

23  for the government is you mentioned that you have no -- that

24  the reason for reviewing these e-mails basically is because

25  you can and that the government's position is not -- I'm

PROCEEDINGS                                                17

1   quoting from your letter of June 16th, Mr. Buford -- that the

2   government's position is not borne out of a hope to gain a

3   strategic advantage by gaining e-mails exchanged between

4   attorneys and their client.  But, quite frankly, I don't see

5   what other possible reason you could have for reading an

6   attorney-client e-mail.

7           MR. BUFORD:  Your Honor, let me try and explain.

8   Because of the technology that the BOP has and because of the

9   way the e-mails are provided to the government, the

10  possibility exists, without imposing a formal taint team,

11  expending the resources to do that, that the individual

12  prosecutors as they read through the scroll of e-mails may see

13  attorney-client e-mails.

14          Members of the team have no -- I would think in most

15  cases, although it's hard to foresee every eventuality, no

16  interest in reading attorney-client e-mails and would do their

17  best not to read them, I would think.  But under the current

18  system, the government --

19          THE COURT:  That's hogwash.  You're going to tell me

20  you don't want to know what your adversary's strategy is?

21  What kind of a litigator are you then?  Give me a break.

22  Every litigator wants to know what their adversary's strategy

23  is or you spend an awful lot of time trying to figure it out.

24          MR. BUFORD:  We would -- the government has no

25  interest in reading e-mails between Mr. Fodeman and his

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                    18

1  client, and the reason is because we don't want to necessarily

2  invade the defense camp, but the technology here doesn't

3  permit us reliably to do that as we review the e-mails as the

4  prosecution team.

5          The only way to guarantee confidentiality would be

6  to use a formal taint review process, which is an

7  administrative burden the government is unwilling to impose on

8  itself, especially given that it seems no -- there's no real

9  dispute that the e-mails here are not privileged.

10         THE COURT:  But there are other concerns here as

11 well.  First of all, the executive budget is far bigger than

12 the judiciary's budget, okay, and the defense budget.  So

13 forgive me if I'm not overly sympathetic to the issue of the

14 government having to put up a taint team in order to avoid

15 having to look at attorney-client e-mails, because the

16 burden -- and you mention at a time of furloughs and hiring

17 freezes.

18         Well, you know what, the Federal Defenders were

19 furloughed here last year.  The government shut down last

20 year.  These CJA counsel went without pay for a substantial

21 period of time.  And when you say that there are alternatives

22 outside of the e-mail system that allow for attorney-client

23 visits, well, I've done canvassing and I was part of the

24 committee that put out a best practices cost containment memo

25 that was recently sent out to all of the CJA counsel and which

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                    19

1   has been posted on the Court's website, as a result of the

2   sequester, as a result of the government shutdown, to try and

3   find ways that we can preserve our Defender resources and our

4   CJA budget, which just keeps getting cut and cut and cut.

5          And I've had sit-downs with the warden at the MDC to

6   cut down on the amount of wait time that the attorneys have

7   when they get there and then they have to wait for hours

8   sometimes to get their client to come down.  And heaven forbid

9   there should be some security problem at the time, they may

10  never get to see their client that day and then they've got to

11  go back.

12         I've heard not just from Mr. Fodeman from this case

13  and the exhibit that they attached, but it is not an easy

14  thing to arrange for an unmonitored attorney call.  It can

15  take up to three weeks or a month to arrange an unmonitored

16  attorney call.  In the first instance, it usually has to be

17  initiated by the inmate.

18         Now, in this case, Mr. Fodeman has a client who has

19  a high level of education and so it would be an easy thing for

20  Mr. Fodeman to explain to him, this is the procedure you have

21  to follow, and he likely will be more able to execute that

22  than another inmate like the defendant I had before me this

23  morning who only had a third grade education and doesn't speak

24  English.

25         And then he has to initiate the call.  Then the

PROCEEDINGS                                    20

1   Bureau of Prisons, by the time they feel like it, has to

2   arrange for a private room, arrange for the call.  And, again,

3   if a security nightmare happens, that's the end of it,

4   everybody's on lockdown and the call doesn't happen.  But I

5   have heard from respected members of the CJA panel that this

6   is not an unusual occurrence.

7            And it is very costly to have counsel go to the

8   prison.  And we encourage counsel to go to the prison.  These

9   are costs we're willing to pay for, allow the vouchers for

10  these visits.  But you have not had to deal with that

11  bureaucracy which is the BOP, which does not make it easy.

12           I am not surprised to find out that the paralegal

13  had such a difficult time finding the counselor.  It is no

14  excuse that their directory is out of date.  That is no

15  excuse.  There is no reason why they can't get a name of a

16  counselor and why the counselor shouldn't be willing to do

17  this.

18           And, frankly, I don't understand why the BOP would

19  not be willing to look into a technology fix that eliminates

20  the need for them to have to go through the hassle of sorting

21  e-mails, why the government, why the Department of Justice

22  wouldn't be interested in a technology fix that eliminates the

23  cost of taint teams on every single case.  Talk about

24  penny-wise and pound-foolish.  I couldn't see a clearer

25  example of it.

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                    21

1      And I'm going to tell you what we're going to do in
2  this case.  In this case, the government will be precluded
3  from looking at any of the attorney-client e-mails, period.
4  And it will be the responsibility, Mr. Fodeman, of you
5  providing the e-mail addresses of anyone on your defense team
6  whose e-mails should not be looked at by the government.
7      MR. FODEMAN:  Absolutely.
8      THE COURT:  Because I see absolutely no reason why
9  the government should have any interest in this case to look
10  at the attorney-client e-mails other than it's easier for the
11  government and it's more cost-efficient for the government.
12      Now, moving forward, since we're here, where are we
13  going with this?  I know you've gotten a bunch of discovery.
14  So where are we going with this?
15      MR. BUFORD:  Your Honor, the government has made two
16  significant productions of discovery.  I understand the
17  defense is reviewing it now.  I spoke with Mr. Fodeman prior
18  to the conference and I understand that there are additional
19  medical records the defense may be interested in obtaining,
20  and we can work with them to get them those records.
21      As far as the balance of discovery goes, I think it
22  mostly consists of search warrant returns from six different
23  sites that the government searched as part of its
24  investigation.  As I explained at the previous conference,
25  those searches resulted in 37 boxes of hard copy documents

PROCEEDINGS                                          22

1    that the government has begun the process of scanning so they

2    can provide the defense electronically in searchable format.

3    In the meantime, they're available to the defense for

4    inspection.

5              With respect to the electronic documents seized

6    during those searches, the images of various computers, the

7    government has finished the process of extracting from those

8    images usable files, Microsoft Word documents, Excel

9    documents, et cetera.  My understanding is those documents are

10   organized in a foldering structure by site and by computer at

11   a site.

12             We can provide those documents to the defense.  I

13   think I had said in a previous letter we could produce it by

14   disc.  My understanding from the HHS agents is that the volume

15   of the materials is such that it may have to be done on a hard

16   drive instead of a disc.  So I can speak with Mr. Fodeman

17   about that.  I know that typically we ask for the defense to

18   provide us with a hard drive, but in light of budget

19   constraints, we'll see if we can work something out.

20             And so there may be additional documents to produce,

21   Your Honor, in going through the files, but I think the bulk

22   of the discovery outstanding at this point would be the search

23   warrant material.

24             THE COURT:  You can discuss that with Jerry Tritz,

25   but we have had other similar type cases where there have been

PROCEEDINGS                                    23

1   a lot of electronic devices and a lot of information that's

2   been downloaded.  And I would not have a problem authorizing

3   the purchase of a hard drive.  And Jerry Tritz is a font of

4   information, he may know where you can get that at a

5   reasonable price.

6           I don't know if you've done a budget for this case.

7   I deemed this a complex case a while back.

8           MR. FODEMAN:  A mega case, I think.

9           THE COURT:  Yes, and it may be wise to do that in

10  this case, especially if you're looking at the possibility of

11  needing experts and so on.  You can talk to him about doing a

12  case budget and then it will be submitted to me for approval,

13  and this is among the things that he's very helpful on.

14          MR. FODEMAN:  That is absolutely our intention,

15  Judge.  I think we talked a little bit about that.  I've

16  worked with Mr. Tritz on another mega case, CJA case, and he

17  was very helpful in coming up with a way to make it as

18  cost-effective as possible.

19          I will say that my firm has been very supportive in

20  these mega cases, in terms of providing technology to the

21  panel.  We've had two laptops donated in a case in front of --

22  in a case, a similar case.  So we'll get through those issues.

23          THE COURT:  Okay.

24          MR. FODEMAN:  I hoped to even be able to submit a

25  budget by today, Judge, but it takes time to sort of decipher

PROCEEDINGS                                24

1   the discovery, then discuss it with your client, figure out

2   what's important and what's not and then figure out what we

3   need.  So I fully expect that we'll be further down that

4   process by the next time we appear before you and we can take

5   it from there.

6           One issue I'll flag, we -- there may be some

7   technological limitations at the jail in terms of reviewing,

8   which is I'm sure an issue that's been familiar to the Court

9   in the past.  As you noted, Dr. Ahmed is -- he's a smart guy.

10  He's a doctor.  He's fully engaged in his defense.  He wants

11  to be able to help us help him.  And it may be necessary for

12  us to come to you with a fix for that issue and allowing him

13  to see the discovery and work with it.  One might be greater

14  access to the library, where the computers are faster, I

15  understand.

16          THE COURT:  Oh, okay, where the computers are

17  faster, because I know that they have computers on each floor

18  now.

19          MR. FODEMAN:  Right.  And he has full access to

20  that, but I'm foreseeing that's going to be an issue because

21  of just the sheer volume of stuff here, that it might be

22  necessary to be in the library for it.  So I just throw it out

23  there, not because I'm prepared to make an application at this

24  point, but that may be coming.

25          THE COURT:  Okay.  So what's a realistic date that

SHERRY BRYANT, RMR, CRR

PROCEEDINGS                    25

1   given -- it sounds like there's still a lot of preliminary
2   work that needs to be done.  A 60-day date out, perhaps?
3                MR. FODEMAN:  That's fine, Judge.
4                THE COURT:  I'm going to be on trial.  Maybe not
5   quite a 60-day date out.  How is August 15th?  I'm only going
6   to have Fridays available, unfortunately, moving forward.
7                MR. BUFORD:  That's fine with the government.
8                MR. FODEMAN:  That's fine, Judge.
9                THE COURT:  Is 11:00 okay for everyone?
10               MR. FODEMAN:  Perfect.
11               THE COURT:  And do you consent to the exclusion of
12   time, Mr. Fodeman?
13               MR. FODEMAN:  Yes, I do.
14               THE COURT:  Okay.  So 11:00 August 15th for further
15   status conference.  Order of excludable delay is entered on
16   consent, also in the interests of justice, plus this case, as
17   we mentioned earlier, has been designated a complex case and,
18   obviously, for the reasons stated on the record, the
19   adjournment is justified.
20               Anything else that the parties want to raise with me
21   today?
22               MR. BUFORD:  No, Your Honor.  Only that, to the
23   extent that experts and so forth are going to use the e-mail
24   system to communicate with Dr. Ahmed, we would just flag as a
25   potential issue compliance with HIPAA, which is the

PROCEEDINGS                                    26

1    transmission of patient-specific information over e-mail.  Not

2    that I have any bright ideas about how to satisfy that

3    concern.  I just flag it as a potential concern.

4           THE COURT:  You may need to discuss that with your

5    client as well.

6           MR. FODEMAN:  Fair enough.  Thank you for the

7    heads-up.  We'll give some thought to how to deal with that.

8           THE COURT:  All right.  Okay.  Thank you all very

9    much.

10          MR. FODEMAN:  Thank you.

11          MR. BUFORD:  Thank you.

12          (Whereupon, the proceedings were concluded at 3:12

13   p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

27

1          I certify that the foregoing is a correct

2   transcript from the record of proceedings in the

3   above-entitled matter.

4

5                    _____

6                    Sherry Bryant, RMR, CRR
                     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25