UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

UNITED STATES OF AMERICA,

    -   against    -

TUSHAR WALIA,

             Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CR-213 (MKB)

MARGO K. BRODIE, United States District Judge:

On April 10, 2014, Defendant Tushar Walia was charged in a two-count indictment with conspiracy to distribute and possess with intent to distribute a controlled substance, and attempted possession with intent to distribute a controlled substance, which substance contained XLR11, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Sections 2 and 3551 *et seq.* On June 26, 2014, Defendant was charged in a five-count superseding indictment with conspiracy to distribute and possess with intent to distribute a controlled substance, attempted possession with intent to distribute a controlled substance, possession with intent to distribute a controlled substance, conspiracy to import a controlled substance, and importation of a controlled substance, which substance contained XLR11, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952(a), 960(a)(1), 963, and Title 18, United States Code Sections 2 and 3551 *et seq.* On May 17, 2014, Defendant moved to suppress post-arrest statements and tangible evidence obtained after a search of his cellular telephone and certain packages, and to suppress photographic identifications of him made by witnesses. The Court held an evidentiary hearing on June 10, 2014. For the reasons discussed below, Defendant's motion to suppress is denied in its entirety.

## I. Background

### a. Facts alleged in the Complaint

According to the Complaint filed on March 12, 2014, in support of an application for an arrest warrant for Defendant, on or about March 6, 2014 and again on March 8, 2014, agents from Homeland Security Investigations of the United States Department of Homeland Security ("HSI"), detained a total of eight suspicious packages (four on each day), which packages had been shipped from China and were destined for a storage locker in Queens, New York, rented by "Anup Shah" (the "Detained Packages").[1]  (Compl. ¶¶ 1–2.)  The packages contained a substance that was tested and determined to contain XLR11, a synthetic cannabinoid, which is a Schedule I controlled substance.  (*Id.*)

On or about March 9, 2014, and March 10, 2014, agents showed photographic arrays, containing six photographs, to five individuals, all of whom identified Defendant as the individual known to them as Anup Shah.  (Gov. Mem. Opp. Mot. to Suppress ("Gov. Opp.") at 4–5.)

On or about March 11, 2014, HSI agents delivered the Detained Packages to the storage locker and conducted surveillance.  (Compl. ¶ 4.)  The agents observed Defendant collect the packages from the storage locker and subsequently placed Defendant under arrest.  (*Id.* ¶¶ 4–6.)  After HSI agents read Defendant his *Miranda* rights, Defendant admitted that he used the name Anup Shah as an alias.  (*Id.* ¶ 6.)   Defendant also stated that he believed the packages contained synthetic cannabis and that he had received approximately 10 to 12 packages each week since early 2013, earning approximately $20,000 to reship the packages to various addresses in

---

[1]  The underlying facts regarding the government's investigation and subsequent arrest of Defendant on drug charges are discussed in the Court's Memorandum and Order dated June 5, 2014, and are repeated here as necessary to provide context for the Court's decision.

California.  (*Id.*)  Shortly after his arrest, agents searched the packages Defendant obtained from his storage locker (the "Previously Detained Packages") and Defendant's cellular telephone, pursuant to Defendant's written consent and determined that the Previously Detained Packages contained XLR11.  (*Id.* ¶¶ 7–8.)

### b.  Motion to suppress

On May 17, 2014, Defendant moved to suppress all statements and tangible evidence obtained during the March 11, 2014 custodial interrogation, and to exclude the photographic identifications of Defendant made by the witnesses.  (Def. Mot. to Suppress Statements and to Exclude Admission of Suggestive Identification Evidence ("Mot. to Suppress"), Docket Entry No. 14.)  Defendant requested an evidentiary hearing on both of these issues.

### i.  Defendant's submission in support of the motion

Defendant argued that the statements and evidence obtained during the March 11, 2014 custodial interrogation should be suppressed because the government did not obtain a knowing and voluntary waiver of Defendant's *Miranda* rights before interrogating him.  (Mot. to Suppress 4.)  Counsel for Defendant submitted a declaration in support of Defendant's motion stating that Defendant "does not recall being administered his *Miranda* warnings [and] [he] did not voluntarily waive his right to the assistance of counsel before speaking to the government."  (*Id.* at 2.)  The affidavit further stated that Defendant "does not recall" giving consent for federal agents to search the Previously Detained Packages or his cellular telephone.  (*Id.*)

Defendant also argued that the Court should suppress two photographic array procedures conducted by the government as impermissibly suggestive.  (*Id.* at 5–6.)  Defendant asserted that the photographic arrays were "suggestive on their face" because the other photographs in the array bore little resemblance to Defendant and because his photograph was the only one in the

arrays "with a dark background." (*Id*. at 6.)  Defendant requested an evidentiary hearing to inquire into the photographic array identifications, arguing that "[w]ithout an evidentiary hearing, the Court [had] no basis to evaluate the manner of presentation by the officers, how the array was constructed and what instructions were given before and after the purported identifications were made." (*Id*. at 6 (internal quotation marks omitted).)  Defendant also argued that it was "unclear whether the agent[] had any description [of the Defendant] from which to construct a photo array." (*Id*.)

### ii. Government's response in opposition to the motion

The government sought denial of the suppression motion without an evidentiary hearing. (Gov. Opp. 12, 22.)  The government argued that, as a matter of law, Defendant was not entitled to an evidentiary hearing because he "fail[ed] to support his factual allegations with an affidavit from a witness with personal knowledge" and thus "a material factual dispute does not exist and a suppression hearing need not be held." (*Id*. at 14.)  The government further argued that the declaration submitted by Defendant's counsel, absent personal knowledge, was insufficient to create a factual dispute as to whether Defendant voluntarily and knowingly waived his *Miranda* rights to justify a suppression hearing. (*Id*.)  In addition, the government argued that because counsel claimed that Defendant could "not recall" whether he had been administered *Miranda* warnings or given consent to search his cellular telephone and the Previously Detained Packages, his failed memory to recall these events was insufficient, even if true, to create a disputed fact. (*Id*. at 15.)

The government argued that even if Defendant could not recall whether he waived his *Miranda* rights or provided consent to search his cellular telephone and the Previously Detained Packages, certain evidence including the contemporaneous notes by Special Agent Kyler Hardin

who was involved in the investigation and arrest of Defendant, a copy of the Consent to Search form bearing Defendant's signature, and a sworn affidavit by Hardin detailing Defendant's *Miranda* waiver and consent to search demonstrated that Defendant did waive his *Miranda* rights and consented to the searches of his cellular telephone and the Previously Detained Packages. (*Id*. at 15–16.)  The government also submitted the transcript of a telephone call between Defendant and his girlfriend, which took place days after Defendant's arrest, in which Defendant "acknowledges giving his consent to search his cellular telephone."  (*Id*. at 16.)

As to Defendant's motion to suppress the photographic arrays, the government argued that it should also be denied without a hearing because the photographic arrays were not unnecessarily suggestive on their face, and because the government presented evidence attesting that the manner in which the arrays were presented was not unnecessarily suggestive.  (*Id*. at 22.) In particular, the government argued that Defendant's photograph did not stand out from the others even though it had a dark background, because the backgrounds in the photographs ranged in color, the lighting in the photographs varied, and the length of the facial hair on each man depicted was also varied.  (*Id*. at 25.)

### iii.   The Court's June 5, 2014 decision

On June 5, 2014, the Court granted in part and denied in part Defendant's motion to suppress his statements, tangible evidence and the photographic identifications.  (Memorandum and Order dated June 5, 2014, Docket Entry No. 17.)  The Court denied Defendant's motion to suppress his statements and evidence obtained from his cellular telephone and the Previously Detained Packages without a hearing.  (*Id*. at 5.)  The Court explained that an evidentiary hearing "is not required if the defendant's papers in support of the motion to suppress do not create a dispute over a material fact."  (*Id*. at 3.)  The Court found that because Defendant failed to

support his factual allegations with an affidavit from a witness with personal knowledge, he failed to dispute the government's assertion that he was read his *Miranda* warnings, knowingly waived those warnings, and gave consent to search. (*Id*. at 4.) The Court also found that even assuming Counsel's statement was sufficient to oppose the motion, the fact that Defendant could not recall being administered his *Miranda* warnings was "insufficient to contest the government's assertion, as set forth in the Complaint, that Defendant orally waived his *Miranda* rights," and Counsel's allegation that Defendant did not recall giving consent to search his cellular telephone or the Previously Detained Packages did not "contradict the government's claim that Defendant did consent to the search of the packages and the cellular telephone . . . ." (*Id*. at 4.)

The Court granted Defendant's request for an evidentiary hearing regarding the photographic identifications of Defendant. As the Court explained, "[w]hile the government may be correct that neither the arrays nor the manner in which they were conducted was unduly suggestive, the Court has no sworn testimony from which it can conclude that the manner in which the arrays were conducted was not unduly suggestive." (*Id*. at 6.) Accordingly, the Court found a hearing necessary to consider whether the photographic arrays and procedures were unduly suggestive.

### iv.  Defendant's motion for reconsideration

Defendant moved the Court to reconsider its decision on the motion to suppress. (Def. Reply Mem. of Law in Support of Mot. to Suppress ("Def Reply. Mem."), Docket Entry No. 18.) In support of his request, Defendant provided a sworn affidavit stating, among other things, that (1) he "[did] not believe that law enforcement agents advised [him] of [his] *Miranda* rights during the interrogation;" (2) he "did not voluntarily waive [his] right to the assistance of counsel

before making statements;" (3) he was threatened with deportation if he did not cooperate and he felt "pressure[d] to provide statements when the law enforcement agents asked [him] questions;" and (4) he did not recognize the signature on the Consent to Search form dated March 11, 2014, proffered by the government, or recall otherwise providing consent to the government "to search packages or [his] cell[ular] [tele]phone."[2]  (Def. Affidavit, annexed to Def. Reply Mem. as Def. Ex. A.)  Defendant argued that based on his sworn affidavit, there were issues of fact warranting an evidentiary hearing as to whether: (1) he was properly advised of his *Miranda* rights, (2) he voluntarily waived those rights or was improperly coerced into cooperation, and (3) he provided consent for the search of his cellular telephone or the Previously Detained Packages.  (Def. Reply Mem. 4–5.)

### v.    The Court's June 6, 2014 reconsideration decision

On June 6, 2014, the Court granted Defendant's motion for reconsideration and upon reconsideration, granted Defendant's request for a suppression hearing regarding the statements and evidence obtained after the March 11, 2014 custodial interrogation.  (Order dated June 6, 2014.)

### c.    June 10, 2014 Suppression Hearing

On June 10, 2014, the Court heard testimony and received evidence regarding Defendant's motion to suppress his post-arrest statements, tangible evidence obtained as a result of the search of his cellular telephone and the Previously Detained Packages, and the photographic identifications made by witnesses.  (Transcript of Criminal Cause for Hearing

---

[2]  Defendant states in his affidavit that while he recalled signing a different Consent to Search form dated March 12, 2014, and recognizes the signature on that form as his own, he did not recall signing the Consent to Search form dated March 11, 2014, and does not recognize the signature on that form as his signature.  (Def. Aff. ¶¶ 10–16.)

dated June 10, 2014 ("Tr."), Docket Entry No. 26.) The Court heard testimony from Special Agent Hardin, the lead case agent responsible for the investigation of Defendant. (Tr. 73:16–20.) Hardin testified about the circumstances surrounding Defendant's arrest, including advising Defendant of his *Miranda* rights, Defendant's waiver of those rights, and Defendant's consent to search his cellular telephone and the Previously Detained Packages. Hardin also testified about the preparation of the photographic arrays and the procedures used in presenting the photographic arrays to witnesses.

### d. Testimony at the suppression hearing

#### i. *Miranda* warning and waiver

Defendant was arrested on March 11, 2014, at approximately 4:50 p.m. (Tr. 36:25–38:14.) After his arrest, Defendant was transported to a nearby parking lot. (*Id*. at 38:15–16.) Hardin interviewed Defendant while Defendant was handcuffed in the rear passenger seat of a law enforcement vehicle. (*Id*. at 46:5–19.) Hardin conducted the interview with another law enforcement agent, Special Agent Christopher Chen. (*Id*. at 48:23–25.) At the beginning of the interview of Defendant, Hardin advised Defendant of his *Miranda* rights. (*Id*. at 43:15–17.) Hardin's standard practice is to use his *Miranda* card to advise defendants of their rights during his initial field interview. (*Id*. at 46:1–4.) Consistent with this "standard practice," Hardin used his *Miranda* card to advise Defendant of his *Miranda* rights. (*Id*. at 44:8–10.) Defendant responded "yes" to the questions of whether he understood his rights, and whether he was willing to waive his rights to speak to Hardin without a lawyer present. (*Id*. at 44:8–19.) Hardin memorialized Defendant's waiver of his *Miranda* rights in his interview notes, which were taken "contemporaneous with . . . advising [Defendant]" of his Miranda rights. (*Id*. at 44:20–45:23.) Hardin wrote "Miranda/me/verbal/waived" in his interview notes, indicating that he "advised the

[D]efendant of his *Miranda* rights verbally and he waived them verbally." (*Id*. at 45:14–20.)

Written *Miranda* waiver forms were available to Hardin through his agency, but he did not

provide a form to Defendant at the initial interview. (*Id*. at 93:3–5, 19–21.) Defendant did not

ask any questions about his *Miranda* rights, did not give any indication that he did not

understand his rights, did not request an attorney, and did not invoke his right to remain silent at

any point during the initial interview. (*Id*. at 47:19–48:4.) The initial interview lasted "no more

than" twenty minutes. (*Id*. at 48:8–9.)

After the initial interview in the law enforcement vehicle, Defendant was transported to

the HSI office at JFK Airport, where he was interviewed a second time. (*Id*. at 62:10–63:7.) At

the outset of Defendant's second interview, Hardin reminded Defendant of his *Miranda* rights

and Defendant advised Hardin that he still wanted to speak to Hardin without a lawyer present.

(*Id*. at 63:8–15.) During the second interview Defendant did not ask any questions about his

*Miranda* rights, did not give any indication that he did not understand his rights, did not ask to

speak to an attorney, and did not invoke his right to remain silent. (*Id*. at 63:5–17.) After

conducting the "bulk" of the second interview, Hardin provided Defendant with a written

*Miranda* form. (*Id*. at 63:16–64:5.) Defendant signed the *Miranda* form waiving his *Miranda*

rights and Hardin memorialized Defendant's waiver in his contemporaneous notes by writing

"Remind about *Miranda*/waives talk." (*Id*. at 64:6–65:3.) During the second interview,

Defendant was not handcuffed. (*Id*. at 65:19–20.)

### ii. Immigration questioning

Towards the end of the second interview, Hardin questioned Defendant about his

immigration status. (*Id*. at 67:2–9.) Because Defendant "was here in the country illegally

[Hardin] needed [information] to prepare charging documents for the immigration court . . . ."

(*Id*. at 67:20–23.)  Hardin did not threaten Defendant with deportation if he did not cooperate. (*Id*. at 68:10–12.)  Hardin did not recall whether Chen threatened Defendant with deportation if he did not cooperate.  (*Id*. at 68:13–14.)  When discussing the benefits of cooperation with a defendant who does not have legal status, Hardin typically tells the defendant, "[Y]ou're here illegally without status . . . . If you want us to intercede and attempt to keep you here, we can do that . . . .If you feel that's not worthwhile or that's not something you want to do, that's fine, I'll inform the immigration court and you can take it up with them."  (*Id*. at 69:2–13.)  Hardin did not recall making this statement to Defendant but stated that it was possible that he did make such a statement.  (*Id*. at 78:1–79:10.)  Hardin has the authority to "request and obtain deferred action . . . for people who do not have [legal] status in the [United States] or who are otherwise removable."  (*Id*. at 135:23–25.)

### iii. Consent to search cellular telephone and Previously Detained Packages

During the initial interview of Defendant, Chen asked Defendant whether he would consent to law enforcement searching his cellular telephone; Defendant provided verbal consent to the search.  (*Id*. at 49:9–16.)  At the end of the initial interview, Hardin asked Defendant again for consent and provided him with a written consent form.  (*Id*. at 49:15–23.)  The written consent form authorizes the search of Defendant's cellular telephone and the Previously Detained Packages ("March 11, 2014 Consent to Search form").  (*Id*. at 53:2–6.)  Hardin watched Defendant sign the March 11, 2014 Consent to Search form.  (*Id*. at 51:10–11.)  Hardin memorialized Defendant's consent in his contemporaneous notes which state "Consent form signed."  (*Id*. at 53:21–25, 54:9–16.)  Defendant did not ask any questions about the form and did not indicate that he did not understand the form.  (*Id*. at 53:7–12.)

Defendant also provided written consent the following day for law enforcement to search, among other items, the packages that were still at the Public Storage facility ("March 12, 2014 Consent to Search form"). (*Id*. at 100:7–12.) Hardin also watched Defendant sign the March 12, 2014 Consent to Search form. (*Id*. at 102:9–10.) Hardin testified that the signatures on the March 11, 2014 Consent to Search form and the March 12, 2014 Consent to Search form do not appear to be the same. (*Id.* at 102:19–21.) Hardin further testified that the signature on the March 11, 2014 Consent to Search form and the signature on the rental agreement for the locker at the storage facility where Defendant was arrested, appear to be the same. (*Id*. at 58:9–60:1.) The witnesses at the storage facility identified Defendant as the person who rented the locker under the name "Anup Shah." (*Id*. at 58:16–59:10.)

On March 13, 2014, Defendant made a telephone call to his girlfriend from the Metropolitan Detention Center and stated, in sum and substance, that he signed a written consent form for the government to search his cellular telephone. (*Id*. at 71:8–72:5.)

### iv. Photographic array — preparation and identifications

Hardin prepared a photographic array to use for witness identification of Defendant, which array included a 2012 photograph of Defendant and five filler photographs. (*Id*. at 22:22–23:1.) Hardin selected the filler photographs by searching a law enforcement database for "photographs of Indian males born between January 1, 1983 and December 31, 1988." (*Id*. at 23:9–12.) Hardin "searched for individuals with comparable hairstyles and lengths, comparable clothing, [and] comparable facial features" and "also attempted to match the background color of [D]efendant's photograph." (*Id*. at 23:17–22.) When he was unable to match the background color of the filler photographs to Defendant's photograph, Hardin "selected photographs with a variety of background colors." (*Id*. at 23:22–23.) Hardin created different versions of the

photographic array ensuring that Defendant's "photograph [was] in a different position in each of the different versions . . . . to avoid the possibility or suggestion that a choice by one [witness] may have influenced the choice by another."  (*Id*. at 23:24–24:8.)

Before the witnesses made their identifications, Hardin told each witness that  "just because [he] was showing [the witness] these pictures, it did not mean that [the witness] would know anybody pictured or [that] anybody in the group was involved in any kind of criminal activity."  (*Id*. at 26:6–9, 28:21–24, 33:22–25, 36:15–18.)  Hardin also told the witnesses to "bear in mind that features such as, facial hair, hair length, hairstyle, weight, jewelry, clothing, can all easily change."  (*Id*. at 26:9–11, 28:25–29:2, 34:1–3, 36:19–21.)  The witnesses who reviewed the photographic identifications were either Black or White.  (*Id*. at 138:9–139:8.)

Two Public Storage employees and three OPS Storage ("OPS") employees[3] identified the photograph of Defendant as the individual who rented the storage lockers to which the Detained Packages were mailed.  (*Id*. at 25:14, 28:5, 31:18, 32:12, 35:21.)  When the two Public Storage employees made their identifications, there may have been another employee present in the location, (*id*. at 25:20–23, 28:11–14), but if present, that person did not "observe or participate in the identification," (*id*. at 25:24–26:1, 28:15–17).

Hardin presented the photographic arrays to two OPS employees while they were standing "about four feet apart from one another."  (*Id*. at 33:7–10.)  The two OPS witnesses did not speak to each other about their identifications before making their identifications and did not view each other's photographic array.  (*Id*. at 33:11–15.)  Hardin instructed the two witnesses not to confer regarding their identifications "to avoid the possibility or suggestion [that] any choice

---

[3]  Hardin testified that the Previously Detained Packages were addressed to two storage facilities, Public Storage and OPS.  (Tr. 19:13–24.)

or selection made by one would influence any choice or selection made by the other." (*Id*. at 34:4–10.) During the third OPS employee's identification, (*id*. at 36:3–7), one of the employees Hardin had spoken to earlier that day regarding the photographic array was present but did not observe or participate in the identification, (*id*. at 36:8–10).

Having considered Defendant's affidavit submitted in support of his motion to suppress, and the testimony and evidence presented at the suppression hearing, the Court finds Special Agent Hardin to be a credible witness and credits his testimony.

## II. Discussion

### a. *Miranda* **warnings and waiver**

Defendant argues that (1) he does not believe that he was advised of his *Miranda* rights and (2) he did not voluntarily or knowingly waive his *Miranda* rights.

"In *Miranda v. Arizona*, the Supreme Court held that 'in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Georgison v. Donelli*, 588 F.3d 145, 154 (2d Cir. 2009) (quoting *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)). As a procedural safeguard, the Supreme Court established the now familiar *Miranda* warnings, which it believed necessary "to secure the privilege against self-incrimination." *Donelli*, 588 F.3d at 154 (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)). Under *Miranda*, prior to any custodial interrogation, a "person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 443. Statements made by a defendant in a custodial interrogation, without these warnings, will be excluded from evidence. *United States v.*

*Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (per curiam) (citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)).

*Miranda* protections can be waived "provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Mandunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (quoting *Miranda*, 384 U.S. at 444). The government bears the burden of proving by a preponderance of the evidence that such a waiver was (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception," and (2) knowingly, as in "made with the requisite level of comprehension, *i.e.*, a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citations and internal quotation marks omitted). A court is required to consider the "totality of the circumstances surrounding the interrogation" to determine whether the *Miranda* waiver was "both an uncoerced choice and [made with] the requisite level of comprehension." *United States v. Martinez*, 917 F. Supp. 2d 334, 348 (E.D.N.Y. 2013) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The Court must consider "all relevant circumstances, employing a presumption that the defendant did not waive his rights." *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

### i. Defendant was advised of his *Miranda* rights

In his affidavit, Defendant claims that he "do[es] not believe that law enforcement agents advised [him] of [his] *Miranda* rights during the interrogation." (Def. Aff. ¶ 4.) The Court has already considered and rejected Defendant's argument that his inability to "recall" or "believe" that he was advised of his *Miranda* rights is a sufficient basis to suppress his statements. (*See* Memorandum and Order dated June 5, 2014 at 3–5.) As explained in the Court's June 5, 2014 decision, Defendant's inability to recall being administered his *Miranda* warnings is "insufficient

14

to contest the government's assertion, as set forth in the complaint, that Defendant orally waived his *Miranda* rights." (*Id*. at 4.) Defendant's equivocal statement that "he does not believe" he was advised of his *Miranda* rights cannot overcome the extensive and credible testimony of Hardin, which testimony demonstrates that Hardin did advise Defendant of his Miranda rights twice orally — at the outset of Hardin's initial interview of Defendant in the law enforcement vehicle, and at the outset of his second interview of Defendant at JFK Airport. (Tr. 43:14–17, 63:8–10.) Hardin also provided Defendant with a written *Miranda* waiver while conducting the second interview of Defendant. (*Id*. at 63:19–64:5.) Based on the clear, unambiguous and credible testimony of Hardin establishing that Defendant was advised of his *Miranda* rights, as well as the written *Miranda* waiver, and the lack of any evidence from Defendant directly challenging Hardin's testimony, the Court finds that Defendant was advised of his *Miranda* rights. *See United States v. Morel*, No. 09-CR-493, 2010 WL 2545479, at *7–8 (E.D.N.Y. June 18, 2010) (finding that defendant was properly advised of his *Miranda* rights where law enforcement agents credibly testified that he was read his *Miranda* rights and noting the defendant's "initial hesitant assertion in his affidavit that he merely 'd[id] not recall' being advised of his rights.").

### ii. Defendant knowingly waived his *Miranda* rights

Having found that the Defendant was advised of his *Miranda* rights, the Court considers whether Defendant knowingly waived his rights. A waiver of *Miranda* rights is knowing if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (quoting *Moran*, 475 U.S. at 421); *United States v. Medina*, --- F. Supp. 2d ----, 2014 WL 1918633, at *15 (S.D.N.Y. May 8, 2014). "Whether a waiver is 'knowing and voluntary' is a

question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Guzman*, 879 F. Supp. 2d 312, 320 (E.D.N.Y. 2012) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)). Defendant argues that "[g]iven [his] status as a non-citizen [of the United States], and his lack of meaningful prior contact with American law enforcement agents, when faced with threats . . . it is simply not possible that any statements rendered were made after a knowing and voluntary waiver of his *Miranda* rights."[4] (Def. Reply Mem. 9–10.)

Hardin's testimony establishes that Defendant never indicated that he did not understand his rights, or that he wished to speak with an attorney. (Tr. 47:22–48:1, 66:10–14.) Defendant did not ask any questions concerning his *Miranda* rights and did not express any confusion or doubt concerning those rights. (*Id.* at 47:19–21, 66:5–9.) Notably, Defendant's affidavit makes no mention of his inability to comprehend the *Miranda* protections, but merely states that he is "not a citizen of the United States." (Def. Aff. ¶ 8.) The fact that Defendant is not a United States citizen has no bearing on his ability to understand the nature of his *Miranda* rights and the consequences of his decision to abandon them.[5] Moreover, Hardin testified that Defendant *does*

---

[4] As discussed *infra* Part II.a.iii.3, the Court considers and rejects Defendant's claim that alleged "threats" from law enforcement rendered his *Miranda* waiver invalid.

[5] For example, courts have upheld waivers from juveniles, those with limited English capabilities, and those with learning and/or mental disabilities. *See United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997) (mental disability); *United States v. Guzman*, 879 F. Supp. 2d 312, 321, 325–26 (E.D.N.Y. 2012) (juvenile); *United States v. Richardson*, No. 09-CR-874, 2010 WL 5437206, at *4 (E.D.N.Y. Dec. 23, 2010) (collecting cases regarding limited language skills); *United States v. Javed*, No. 08-CR-41, 2009 WL 536071, at *2 (E.D.N.Y. Mar. 3, 2009) ("[E]ven a suspect with limited knowledge of English can make a knowing and voluntary waiver, so long as his command of English was sufficient to enable him to understand the *Miranda* warnings." (citing *Capaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) and *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995)). There is no *per se* rule suggesting which type of defendants, with which type of backgrounds, are able to effectively waive their

have prior experience with law enforcement.  As Hardin testified, Defendant has been arrested

twice — once in 2011, for "either driving under the influence or driving while intoxicated," and

also in 2012, for "among other things, forgery, criminal impersonation of another person and

false impersonation." (Tr. 61:11–62:2.)  Having found no evidence suggesting any limitation on

Defendant's ability to understand the rights and protections explained to him, the Court finds that

Defendant knowingly waived his *Miranda* rights.  *Morel*, 2010 WL 2545479, at *8 (defendant

knowingly waived *Miranda* rights where there was no evidence that he was unable to

comprehend such rights).

### iii.   Defendant voluntarily waived his *Miranda* rights

Defendant claims that he did not voluntarily waive his *Miranda* rights because of

"threats" and coercion from law enforcement.  (Def. Reply Mem. 7–8.)  According to Defendant,

a law enforcement agent told him, "If you don't cooperate with us, you are going to get

deported" and that he "was going to jail for a long time regardless of whether or not [he]

cooperated, but that if [he] cooperated, they would provide assistance with [his] immigration

status to ensure that [he] would not be separated from [his] family." (Def Aff. ¶¶ 6–7.)   In

assessing whether a defendant's waiver of his or her *Miranda* rights was voluntary, the Court

must examine the totality of the circumstances including, "1) the accused's characteristics, 2) the

conditions of the interrogation, and 3) the conduct of the police." *Parsad v. Greiner*, 337 F.3d

175, 183 (2d. Cir. 2003) (citing *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991));

*United States v. Romano*, No. 12-CR-691, 2013 WL 5278420, at *4 (E.D.N.Y. Sept. 18, 2013)

---

*Miranda* rights.  Rather, "the question of waiver must be determined on the particular facts and
circumstances surrounding [the] case, including the background, experience, and conduct of the
accused." *Richardson,* 2010 WL 5437206 at *4 (citing *North Carolina v. Butler*, 441 U.S. 369,
374–75 (1979)).

(same).  "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'"  *United States v. Male Juvenile*, 121 F.3d 34, 41 (2d Cir. 1997) (quoting *Moran*, 475 U.S. at 421); *Medina*, --- F. Supp. 2d ----, 2014 WL 1918633, at *15.  "Coercive police activity [therefore] is a necessary predicate to finding that a waiver of *Miranda* rights was not voluntary."  *Id.* (citing *Cornado v. Lefevre*, 748 F. Supp. 131, 139 (S.D.N.Y. 1990) (quoting *Colorado v. Connelly*, 479 U.S. 157 (1986))).  Applying the Second Circuit's three-factor test in assessing the voluntariness of Defendant's *Miranda* waiver, the Court finds that Defendant's waiver was voluntary.

### 1.  **Defendant's characteristics**

The Court first considers the characteristics of Defendant.  "The relevant characteristics of the accused are the individual's experience and background, along with the individual's youth and lack of education or intelligence."  *Saunders v. Lavalley*, No. 10-CV-5896, 2014 WL 2624763, at *15 (S.D.N.Y. June 10, 2014) (citing *Green v. Scully*, 850 F.2d 894, 902 (2d. Cir. 1988)); *United States v. Guzman*, 879 F. Supp. 2d 312, 325 (E.D.N.Y. 2012) (same).  Defendant states that he is not a citizen of the United States and argues that he is not familiar with the American justice system.  (Def. Aff. ¶ 8; Def. Reply 9–10.)  However, as Hardin testified, Defendant has been in the United States since 2001 when he was thirteen years old, (Tr. 67:16), he received his high school diploma with honors in 2005, (*id.* at 70:12–13), and he studied applied sciences in avionic/business management at Vaughn College of Aeronautics, (*id.* at 70:13–14).  In addition, Defendant has had prior contact with the criminal justice system — having been arrested on two prior occasions.  (*Id.* 61:11–62:2.)  Given the fact that Defendant has been living in the United States for thirteen years, his advanced educational level and his prior contacts with law enforcement, the Court finds that Defendant's characteristics weigh in

favor of a finding that he voluntarily waived his *Miranda* rights. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("[T]here is no indication in this record that [defendant] was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice." (quoting *United States v. Watson*, 423 U.S. 411, 424–25 (1976))).

### 2. Conditions of Defendant's interrogation

The second factor requires the Court to consider the conditions of the interrogation, including "the conditions under which a suspect is questioned and the length of detention." *Green*, 850 F.2d at 902 (internal citations omitted). Here, Defendant was questioned initially while handcuffed in the rear passenger seat of a law enforcement vehicle, (Tr. 46:16–19), and later questioned without being handcuffed at the HSI office at JFK Airport, (*id*. at 62:12–63:6, 65:19–20). Defendant states in his affidavit that he was "interrogated . . . over the course of several hours." (Def. Aff. ¶ 2.)

Hardin testified that the initial interview was "no more than 20 minutes," (*id*. at 48:7–9), followed by a twenty-minute drive to JFK Airport, (*id*. at 62:20–21), twenty minutes when Defendant was placed in a cell, (*id*. at 63:3–7), and a second interview, (*see id*. at 62:25–63:7. Although Hardin did not indicate how long the second interview lasted, he did state that in the length of time it took for a second agent to locate a *Miranda* form for Defendant to sign during the second interview, he had "already gone through a bulk of the interview." (*Id*. at 63:25–64:5.) Hardin testified that his weapon was not displayed during either interview and he did not recall seeing Agent Chen's weapon displayed. (*Id*. at 47:4–15, 66:1–4.) Defendant was offered food and water, and accepted the offer of water. (*Id*. at 63:2–3.) Defendant was "somewhat nervous" during the first interview, (*id*. at 48:14–17), but was calm during the second interview, (*id*. at 65:21–22). Hardin and Chen were conversational and calm. (*Id*. at 47:1–10, 65:23–25.) These

conditions do not demonstrate a coercive atmosphere. *See e.g. United States v. Yongwang*, No. 11-CR-730, 2013 U.S. Dist. LEXIS 16153, at *21, n.1 (S.D.N.Y. Feb. 5, 2013) (waiver voluntary where, among other things, "there is no . . . evidence that [the defendant] complained at any point about the conditions of the interrogation . . . [i]ndeed, agents did not handcuff [defendant] until it came time to [transport him]"); *United States v. DiLorenzo*, No. S1 94-CR-303, 1995 WL 366377, at *6 (S.D.N.Y. June 19, 1995) (no coercive conditions where interrogation lasted approximately two and a half hours, defendant was not handcuffed and was permitted to smoke).

### 3.    Conduct of the agents

Defendant claims that law enforcement agents threatened him with deportation, and promised assistance with his immigration status so that he would not be separated from his family if he cooperated. (Def. Aff. ¶¶ 6–7.) Hardin testified that when discussing the benefits of cooperation with a defendant who does not have legal status, his usual practice is to tell the defendant, "[Y]ou're here illegally without status . . . . If you want us to intercede and attempt to keep you here, we can do that . . . . If you feel that's not worthwhile or that's not something you want to do, that's fine I'll inform the immigration court and you can take it up with them." (Tr. 69:2–16.) Hardin did not recall whether he made this statement to Defendant but stated that it was possible he did make such a statement. (*Id*. at 78:1–79:10.)

The Second Circuit has made clear that "a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." *United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990) (citing *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987)). In fact, "law enforcement agents '[are] free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate." *Id*. (alterations in original)

(citing *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989)).  "[S]tatements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive . . . . Statements such as these are merely common sense factual observations."  *Ruggles*, 70 F.3d at 265 (citations omitted).  Thus, even assuming that the agents told Defendant the benefits of cooperation — stating, as Defendant claims, that they "would provide assistance with [his] immigration status" if he cooperated and that if he did not cooperate, he would get deported[6] — such statements do not render the interrogation coercive or Defendant's *Miranda* waiver invalid.  *See United States v. Rijo-Carrion*, No. 11-CR-784, 2012 WL 6617388, at *7–8 (E.D.N.Y. Dec. 19, 2012) (comments by officer pointing out that the defendant was found smuggling drugs and that it would be beneficial for him to cooperate did not render *Miranda* waiver involuntary); *United States v. Ho*, 930 F. Supp. 858, 863 (W.D.N.Y. 1995) (statement that agent would help defendant if she cooperated is not coercive); *United States v. Cooper*, No. 95-CR-0031, 1995 WL 469702, at *3 (S.D.N.Y. Aug. 8, 1995) ("[S]tating that a defendant faces 'heavy penalties' and indicating that cooperation is 'the wisest course of action' does not alone rise to the level of coercion." (citing *Bye*, 919 F.2d at 9 (quoting *United States v. Pomares*, 499 F.2d 1220, 1221–22 (2d. Cir. 1974)))).  The critical inquiry is whether "under the totality of the circumstances . . . the defendant's will was overborne by the agent's conduct."  *United States v. Broccolo*, 797 F. Supp. 1185, 1195 (S.D.N.Y. 1992) (citing *United States v. Anderson*, 929 F.2d at 99).  Under the circumstances here, the Court finds that Defendant's waiver was voluntary.  *See Broccolo*, 797 F.

---

[6]  Hardin testified that he did not tell Defendant that if he did not cooperate, he would get deported or that he could provide assistance with Defendant's immigration status, (Tr. 68:10–12, 20–24), although Hardin dos not recall if he gave Defendant his usual speech regarding the benefits of cooperation, (*id*. at 78:1–79:10).  Hardin also could not recall whether Agent Chen made such statements.  (*Id*. at 68:13–14, 68:25–69:1).  The Court assumes for the purposes of this Memorandum and Order that such statements were made to Defendant.

Supp. at 1195 ("[A] statement by a defendant is not rendered 'involuntary' merely because a law enforcement officer informed the defendant of the penalties he faced, that he would receive more lenient treatment if he cooperated, of the nature of the evidence against him, or of the possible sentence he would face and the benefits he would gain by cooperating.").[7]  Under the totality of the circumstances, Defendant's waiver of his *Miranda* rights was voluntary.

### b.  Consent to search forms and signatures

Defendant claims that he does not recall giving consent to the government to search his cellular telephone or the Previously Detained Packages. (Def. Reply. 11; Def. Aff. ¶¶ 10–13, 17.) Defendant's claim that he does not "recall" providing consent for the searches fails for the same

---

[7]  The Court notes that the Second Circuit has held that even worrisome comments by police officers "will not —without more — require suppression."  *United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990) (collecting cases).  For example, in *United States v. Duvall*, the Second Circuit found suppression warranted where a defendant made statements under coercive circumstances going beyond mere comments from the prosecutor.  537 F.2d 15, 24 (2d Cir. 1976).  In *Duvall*, the Second Circuit considered the totality of the circumstances including the following, in determining that the defendant's waiver was involuntary:

> A defendant arrested with considerable force on one day, interrogated and processed for the balance of that day, jailed for the night, returned to his interrogators for the trip to arraignment before a magistrate, suddenly finds himself closeted with an Assistant U.S. Attorney who, unbeknownst to the defendant, had drawn up a complaint against him before his arrest and was about to go before a magistrate to begin the prosecution.  Unarraigned and uncounseled for 20 hours, the defendant is taken through the questions answered the previous day, this time with a warning from the prosecutor that, if the case goes to trial, he can be sentenced to 100 years in prison.

537 F.2d at 24; *see also Bye*, 919 F.2d at 10 (finding that "the district court improperly utilized a *per se* approach" in finding coercion as a result of an officer's comments); *United States v. DiLorenzo*, No. S1 94-CR-303, 1995 WL 366377, at *7 (S.D.N.Y. June 19, 1995) (noting that even if officer made "inappropriate comments" to defendant, when viewed in the totality of the circumstances, such comments did not overbear defendant's will).

reasons outlined above in Part II.a.i with respect to Defendant's inability to recall whether he received *Miranda* warnings — it is insufficient to overcome the credible testimony by Hardin that Defendant did consent to the searches and signed the March 11, 2014 Consent to Search form. (Tr. 49:9–11.)

"A warrantless search is '*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One exception is where the search is undertaken pursuant to consent. *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004); *United States v. Javed*, No. 08-CR-41, 2009 WL 536071, at *2 (E.D.N.Y. Mar. 3, 2009). The government "bears the burden of proving by a preponderance of the evidence that the consent was voluntary." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006). In assessing voluntariness, district courts are to bear in mind the "totality of the circumstances," *id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 227 (1973)), including "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 227.

Hardin testified that Defendant provided verbal consent for the search of his cellular telephone, first, at the beginning of his initial interview and again at the end of the initial interview. (*Id*. at 49:9–16.) After Hardin asked Defendant the second time for consent to search his cellular phone, he provided Defendant with the March 11, 2014 Consent to Search form, permitting the search of both Defendant's cellular telephone and the Previously Detained Packages, and Hardin watched Defendant sign the form. (*Id*. at 49:13–23, 51:9–11, 53:2–6.) In addition, Defendant's claim is belied by his statement to his girlfriend during a recorded telephone call admitting that he provided consent to the agents to search his cellular telephone.

(*Id*. at 71:1–72:5.)

Defendant's argument that the signature on the March 11, 2014 Consent to Search form is "a forgery," (Def. Reply 11), is also belied by the record. The forgery allegation is a very serious allegation, particularly as it suggests misconduct by government agents. However, having heard the testimony of Hardin and reviewed all of the evidence presented at the suppression hearing, the Court credits Hardin's testimony over Defendant's sworn statement.[8]

Hardin watched as Defendant signed the March 11, 2014 Consent to Search form. (Tr. 51:9–11.) Hardin testified that the signatures on the March 11, 2014 Consent to Search form and the March 12, 2014 Consent to Search form do not appear to be the same. (*Id*. at 102:11–21.) However, Hardin also testified that the signature on the March 11, 2014 Consent to Search form and the signature on the rental agreement for the locker at the Public Storage facility where Defendant was arrested, do look the same. (*Id*. at 58:9–60:1.) The Public Storage employees identified Defendant as the individual who rented the storage locker. (*Id*. at 58:16–59:10.) Having reviewed the signature on the March 11, 2014 Consent to Search form and compared it with the signature on the rental agreement from the Public Storage facility, the Court agrees with Hardin that the signatures are similar. (*Id*. at 59:20–60:1.) The evidence demonstrates that while Defendant may have used a different signature when he signed the March 11, 2014 Consent to Search form, from the signature he used on the March 12, 2014 Consent to Search form, Defendant did sign the March 11, 2014 Consent to Search form. Accordingly, the Court finds that Defendant did provide the government with consent to search his cellular telephone and the Previously Detained Packages.

---

[8] "As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination." *United States v. Medina*, No. S3 13-CR-272, 2014 WL 1918633, at *12 n.13 (S.D.N.Y. May 8, 2014) (collecting cases).

### c. Photographic identifications

Defendant moves to suppress the photographic identifications made by witnesses, arguing that the photographic arrays were suggestive on their face and questioning the manner in which the arrays were presented to the witnesses and the instructions provided prior to, and after, the identifications. The Court finds that the photographic arrays were not suggestive on their face, and based on Hardin's testimony, nor were they presented in a suggestive manner.

Exclusion of a pre-trial identification is warranted "only if the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Bautista*, 23 F.3d 726, 729 (2d. Cir. 1994) (alteration in original) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). "When a witness has made a pretrial identification, the analysis of whether he is to be permitted to identify the defendant at trial normally requires a one-step or two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990). "The first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt." *Id.* In making this determination the court must consider several factors including "the size of the array, the manner of presentation by the officers, and the array's contents." *Id.* at 974.

"When the composition of [a] photo array or line-up[] [is] challenged as unfair, the appropriate inquiry for the Court to undertake is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit." *United States v. Padilla*, No. S1 94-CR-313, 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994) (internal quotation marks omitted) (citing *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)). "Even if there are some physical differences, a photo array or line-up will not be suggestive so long as the other

pictures or stand-ins sufficiently resemble[] the defendant 'to allay any concern that the witnesses might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others.'" *Id.* (citing *Gossett v. Henderson*, No. 87-CV-5868, 1991 WL 135601, at *2 (S.D.N.Y. July 18, 1991), *aff'd mem.*, 978 F.2d 705 (2d Cir. 1992)).

If the procedures were not unduly suggestive, "the trial identification testimony is generally admissible without further inquiry into the reliability of the pretrial identification." *Maldonado-Rivera*, 922 F.2d at 973. If, however, the procedures were unduly suggestive, the court must "weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures." *Id.* In making this determination, the court must look at factors such as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 974–75 (quoting *Neil v. Biggers,* 409 U.S. 188, 199–200 (1972)).

Defendant argues that the photographic arrays were suggestive on their face because the filler photographs "bear little physical resemblance to [Defendant]" and Defendant's photograph was the "only one in the arrays with a dark background." (Def. Mot. to Suppress 6.) The Court disagrees that the arrays were suggestive. First, while there are some differences in skin tone and the physical build between *each* of the individuals pictured in the array, nothing about Defendant's photograph stands out from the others to make the array suggestive on its face. *See United States v. Thai*, 29 F.3d 785, 809 (2d Cir. 1994) (finding photographic array not suggestive where the "men pictured appeared to be of roughly the same age and had similar hair color

[with] a wide variety of hairstyles and a mixture of men with and without facial hair"); *United States v. Jakobetz*, 955 F.2d 786, 803 (2d Cir. 1992) (affirming district court determination that photographic array was not suggestive where it depicted "male Caucasians of approximately the same height and hair features [and where] at least three of them, including [the defendant] had very similar builds"); *see also Padilla*, 1994 WL 681612, at *6 ("[T]he due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility [t]o defeat a charge of suggestiveness, the government is not required to show that the other pictured individuals or stand-ins have physical features nearly identical to those of the defendant.").[9]

Nor is the Court persuaded by Defendant's challenge to the "dark" background color in his photograph. The array features a variety of background colors and as a result, no one picture stands out because of its background color. *See United States v. Douglas*, 525 F.3d 225, 243 (2d Cir. 2008) (affirming finding by district court that photographic array was not suggestive because, in part, "no two [background colors] are the same, and no picture stands out because of its background color"); *United States v. Cleveland*, No. 12-CR-6109G, 2013 WL 4759081, at *7

---

[9] The fact that *each* of the individuals pictured in the array differ from one another in terms of skin tone arguably weighs against a finding that the array is unduly suggestive. "[H]eterogeneity in . . . photographs that comprise an array may weigh against" a finding that the array is suggestive. *United States v. Zadiriyev*, No. 08-CR-1327, 2009 WL 1787922, at *2 (S.D.N.Y. June 23, 2009) (noting differences between each of the individuals pictured in the photographic array including their clothing, eye color and facial hair and finding that the defendant did not stand out from the others); *United States v. Jones*, 652 F. Supp. 1561, 1569 (S.D.N.Y. 1986) (noting that "each picture in the photospread differs from the others in terms of its color, tone, hue and quality" and finding that "the small differences between [the defendant] and the others are not such 'unnecessarily striking differences' that they cause [the defendant's] photograph to 'stand out prominently' from the rest in an impermissibly suggestive fashion" (quoting *United States v. Harrison*, 460 F.2d 270, 271 (2d. Cir. 1972))).

(W.D.N.Y. Sept. 3, 2013), *report and recommendation adopted*, No. 12-CR-6109G, 2013 WL

6440949 (W.D.N.Y. Dec. 9, 2013) (noting that "[the defendant's] photograph has a similar

background hue to three of the other photographs [and] although, two of the photographs contain

a noticeably grayer background . . . . these differences in color and shading do not draw the

viewer's eye to [the defendant's] photograph and are not significant enough to" be suggestive).

For these reasons, the Court finds that the photographic arrays were not suggestive on their face.

Defendant also questions the manner in which the photographic arrays were presented to

the witnesses. Hardin was questioned extensively regarding the circumstances under which he

presented the photographic arrays, including any instructions he provided to the witnesses, and

the witnesses' conduct while making their identifications. Based on Hardin's testimony, the

Court finds that the procedure used by Hardin was not suggestive.

Hardin testified that he told each witness when giving them the array that he was showing

them a group of photographs and that the witness should let him know if he or she recognized

anyone in the array but just because he was showing the witness the array, it did not mean that

the witness would know anyone pictured in the array or that anyone pictured in the array was

involved in any kind of criminal activity. (*Id*. at 26:6–9, 28:21–24, 33:22–25, 36:15–18.) He

further advised each witness to "bear in mind that features such as facial hair, hair length,

hairstyle, weight, jewelry, clothing, can all easily change." (*Id*.) He did not make any comments

with respect to any particular photograph in the array. (*Id*. at 26:12–14, 29:10–13, 34:11–13,

36:22–24.) Nothing in the instructions Hardin provided to the witnesses was suggestive. The

fact that other individuals may have been present in the locations during the identifications is

also not suggestive since Hardin testified that they did not participate in the identification

procedures. (*Id*. at 25:20–26:1.) There is no evidence from which the Court can infer that their

presence had some bearing on the likelihood of the witnesses identifying Defendant from the photographic array. Similarly, the fact that two of the identifications were conducted simultaneously provides no support for a conclusion that the manner of presentation was suggestive, particularly in light of the fact that the witnesses were standing four feet apart, were instructed not to confer with one another, and were presented with different photographic arrays that included the Defendant's photograph in different locations. (*Id*. at 33:7–34:6, 124:2–23.) Accordingly, the Court finds that the photographic array procedures were not suggestive.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion to suppress his statements, tangible evidence and the photographic identifications in its entirety.


SO ORDERED:

_____ s/ MKB _____
MARGO K. BRODIE
United States District Judge


Dated: July 18, 2014
      Brooklyn, New York