# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

July 22, 2014

**Via ECF**
The Honorable Margo Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: **United States v. Tushar Walia (14-CR-213)**
**United States v. Tushar Walia (14-CR-365)**

Dear Judge Brodie:

We write in response to the government's July 16, 2014 letter ("Gov't Resp."), and the government's July 17, 2014 letter ("Gov't Supp. Resp.") opposing our July 9, 2014 requests that this Court issue an order ("Def. Mot.") barring the government from reviewing any electronic correspondence sent through Bureau of Prison's email system ("TRULINCS") between Tushar Walia and any e-mail account associated with the Federal Defenders of New York. We briefly respond to arguments raised by the government, point out an obvious technological fix that has not yet been considered, and renew our request for this Court, pursuant to its inherent discretionary powers over matters relating to discovery, to order the government not to review the aforementioned communications.

## ARGUMENT

### I. The Burden on Mr. Walia of the Government's New Policy is Unreasonably High

In response to our request, the government asserts no interest in reading Mr. Walia's email communications with his attorneys per se.[1] Instead, the only rationale the government

---

[1] In a proceeding before Judge Irizarry referenced in our original letter, the government similarly represented that it did not hope to gain a strategic advantage by reading the attorney-client TRULINCS emails, but merely sought to secure the administrative convenience of foregoing the necessity of a formal taint team. Def. Mot., App'x A at 17-18.

1

advances to justify its sweeping new policy of reading all BOP inmate e-mail obtained from the TRULINCS system, including attorney-client communications, is mere administrative convenience. Gov't Resp. at 1. As the government presents the issue, it has changed its longstanding policy of not reviewing attorney-client emails obtained from TRULINCS for the exclusive reason that it wishes to forgo the expense of establishing a formal taint team for each case in which TRULINCS emails are obtained. Id. at 5. The government's previous policy was to establish a taint team consisting of an Assistant U.S. Attorney and a paralegal, neither of whom had been assigned to work on the inmate's prosecution. This taint team was then charged with reviewing all of the inmate's TRULINCS e-mail and segregating out any e-mails between the inmate and his defense team. Id. at 6. Without providing any supporting budgetary figures that would support its claim that the expense of maintaining formal taint teams is infeasible, the government asks this Court to sign off on its new policy, notwithstanding any burdens it may place on Mr. Walia's ability to secure meaningful representation in defense against the criminal charges the government has brought against him.

With respect to the burden on Mr. Walia, the government contends that its decision to review all TRULINCS e-mails does not substantially burden Mr. Walia's ability – or, for that matter, the ability of any of the Federal Defenders' indigent clients – to secure meaningful legal representation. Gov't Resp. at 5. The government's contention is wrong. First, the government's premise that "[d]efense counsel's communication of non-sensitive information – such as routine scheduling matters and public telephone numbers – to the defendant via e-mail would divulge no strategic information about the defense to the government" misrepresents our position, and also misses the point. We are not arguing that our clients need access to unmonitored e-mail communication with their attorneys only in order to communicate routine logistical matters. The government's selective quotation from our letter omits a clause referencing "question[s] about a piece of discovery" posed via e-mail that obviously could elicit a reply containing strategic information about the defense's case. Def. Mot. at 3. Moreover, as a general matter, it is simply not possible ex ante to discern whether particular information, particularly when elicited in response to a question posed to a client, could potentially divulge strategic information. Consequently, in light of the government's new policy, our ethical obligation to our clients requires us to refrain from discussing over e-mail anything but the most mundane details with our clients held by the Bureau of Prisons.

Second, the government's contention that unmonitored phone calls between clients and their attorneys are an alternate means of communication that are "equivalent to monitored email communications" does not correspond with the reality of incarceration in BOP facilities. Speaking confidentially with Mr. Walia – or, for that matter, any of our clients held at MDC – is not as simple as picking up the phone. As we pointed out in our initial letter, for defense counsel to initiate unmonitored phone calls with our clients held at MDC requires pre-approval by the Warden. All told, the application process for pre-approval can last several days. Application for pre-approval must be made in writing, and sent through the mail. Typically, it takes several days before MDC staff responds, either approving or denying the request. Needless to say, if the application is denied, then the process must begin again, with another written request sent through the mail. The pre-approval process for unmonitored phone calls is not simply an exercise

2

in paper shuffling: it is not unusual for attorneys to be denied permission to speak confidentially to their clients over the phone.

The government's suggestion that we "email the inmate via TRULINCS and ask him to call [us] on a monitored line," Gov't Resp. at 3, similarly reflects a lack of familiarity with the day-to-day operation of the MDC. Because of circumstances particular to the jail environment that arise on a regular basis, including long wait times due to high demand for phones, as well as security situations and technical difficulties that prevent all inmates from being able to place phone calls, our clients report that on a given day, it may not be possible for them to access the phone lines. In light of these challenges, even if an inmate were to receive such a request from his attorney, there is no guarantee that he would be able to respond over an unmonitored phone line in a timely manner. In contrast, the inmate could immediately respond over e-mail. The government's contention that unmonitored phone calls are equivalent to e-mail communication is therefore unsupportable.

Furthermore, the government does not contend that the other alternate means of privileged communication it puts forward, including unmonitored in-person visits, and "special mail" correspondence, are equivalent to e-mail communication. Indeed, such a contention could not be sustained. E-mail has become central to the work of virtually all professions, and the legal profession is no exception: e-mail is how business is done. In light of the hours of travel and waiting time required for personal visits to the MDC, as well as the weeks of delay in the sending and receiving of "special mail," it would be impossible to argue that either of these alternatives match e-mail in terms of convenience or reliability. As such, the government's new policy of reviewing all inmate e-mail significantly burdens Mr. Walia, and all of our clients, because it forces us to engage in alternate means of privileged communication that are both time and resource intensive, where a simple e-mail would suffice. For indigent defendants, this burden is particularly harsh. At the Federal Defenders, the average attorney caseload is approximately 50 clients, a significant number of whom are detained at the MDC. No one disputes that it would be physically impossible for our attorneys to visit or make phone calls to more than a handful of their jailed clients in the same day. However, it would be completely unremarkable for our attorneys to conduct an e-mail exchange with most, if not all, of their jailed clients in a single day. By depriving our clients of the ability to communicate with their attorneys over e-mail, the government's new policy is therefore ensuring that they have less access to their attorneys than clients who can afford to retain private counsel with lower caseloads and more resources to expend on in-person visits, and more support staff to make the necessary arrangements for unmonitored phone calls.

In support of its position, the government makes the conclusory observation that prior to the implementation of TRULINCS, "the other modes of communication available to defendants to communicate confidentially with counsel. . . were sufficient to satisfy the Sixth Amendment… and they are similarly sufficient now." Gov't Resp. at 5. The government's reasoning is flawed because the relevant comparison is not between criminal defendants today and criminal defendants prior to the implementation of TRULINCS; rather, it is between indigent defendants and defendants able to afford retained counsel *today*, in the era of widespread e-mail communication. The Supreme Court recently held that the prevalence of cell phones, *inter alia*,

3

required a shift in Fourth Amendment jurisprudence to reflect the changing reality of how people carry and store sensitive personal information:

> [T]here is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception.

Riley v. California, 134 S. Ct. 2473, 2490 (2014) (holding that the digital information on a cell phone, unlike other objects found on the person, may not be searched incident to a lawful custodial arrest under the Fourth Amendment).

E-mail pervades contemporary life to an extent that is indistinguishable from the cell phones at issue in Riley. If the BOP is going to offer e-mail communications to inmates in its facilities, it therefore places an unreasonable burden on those inmates for the government to preclude using that technology to facilitate confidential communication with their attorneys. The government's new policy burdens Mr. Walia by preventing him from securing access to meaningful representation in accordance with the legal profession's contemporary standards. Therefore, absent a showing of any substantial government interest, this Court should exercise its broad inherent powers to control discovery and issue an order preventing the government from reading Mr. Walia's e-mail communications with his defense team.

## II.    There is an Obvious Technological Solution

Given the high burden the government's change in policy places on criminal defendants like Mr. Walia, and in light of the government's insistence (however incredulous) that it does not seek to gain any strategic advantage from monitoring our e-mails with Mr. Walia, it is difficult to understand why the government does not instead seek a technological solution. As Judge Irizarry highlighted in a recent proceeding discussed in our prior letter:

> We are in the 21st Century. The technology we have now is incredible. . . and I find it very hard to believe that the Department of Justice, with all of the resources that it has, with the access to the Department of Homeland Security and NSA, cannot come up with a simple program that segregates identified email addresses.

Def. Mot., App'x A at 11. In its response to our initial letter, the government offers no explanation of why it would be infeasible to avoid reading e-mails between defense attorneys and their clients held at BOP facilities beyond its stated preference to avoid reestablishing the "taint teams" that were part of its normal practice prior to the new policy. Gov't Resp. at 5. As previously mentioned, the government's stated administrative preference is unsupported by budgetary figures that would demonstrate that the government's fiscal situation actually precludes them from maintaining taint teams.

We are therefore forced to speculate about possible ways that the DOJ and the BOP could, without making any significant modifications to the TRULINCS program, 1) continue to provide inmates with access to e-mail communications, while also 2) refraining from reading any

attorney-client e-mails thereby obtained. Notwithstanding our admittedly dim understanding of the inner workings of TRULINCS, it is not difficult to imagine an technological solution that could achieve both goals: BOP could simply assign each inmate two e-mail addresses, one to be used for attorney-client communications, and another for all other communications.

Based on the information about TRULINCS currently available to us, this solution would be technologically feasible. Presumably, assigning inmates two e-mail addresses would be a simple matter of apportioning storage space on the TRULINCS e-mail servers, and would not require investments in additional server capacity or bandwidth. Furthermore, given that BOP has the capacity to review and censor all outgoing e-mail messages sent over TRULINCS, the BOP could certainly ensure that an inmate could only use the designated e-mail address to send messages to a list of approved e-mail addresses associated with the attorneys and paralegals working on his or her defense team. As a matter of course, the government could therefore request that BOP turn over an inmate's e-mail only from the address used for non-attorney communication, thereby eliminating the risk of the government inadvertently reading attorney-client email communications.

### III.   Recent <u>Asaro</u> Order is Inapposite Because Court Did Not Consider Specific Issues Raised Here

In its supplemental response, the government brings to the court's attention a recent decision byJudge Ross denying a similar motion in <u>United States v. Vincent Asaro</u>, 14-CR-26 (ARR) (E.D.N.Y. July 17, 2014). Gov't Supp. Resp. We briefly note that the <u>Asaro</u> order is inapposite because in that case the defendant's supporting motion did not address the full range of issues we have raised here. <u>See Asaro</u> Brief in Support, Def. Ex. A. Specifically, the defendant's brief in <u>Asaro</u> did not fully address the burden that the government's new policy puts on criminal defendants, including the complexity of securing pre-approval for an unmonitored phone call. Moreover, because the order arose in a case where a defendant was represented by CJA counsel, the arguments we have raised that go to the importance of preserving the Federal Defenders' ability to provide their clients with meaningful representation that is in accordance with the legal profession's contemporary standards were not addressed by Judge Ross's order. Finally, we note that Judge Ross did not consider the "two-email address" technological solution we advance here. We therefore respectfully request that the Court reach its decision on the merits of the briefs before it.

Respectfully Submitted,

   **/S/ Amanda L. David**
Amanda L. David
Counsel to Tushar Walia
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16TIj Fl.
Brooklyn, NY 11201
(718) 330-1208

5

cc: Chambers of the Honorable Margo Brodie (via hand delivery and e-mail)

Government's Counsel of Record (via ECF and e-mail)

## Defendant's Exhibit A: Asaro Brief in Support

## Steve Zissou & Associates
### Attorneys at Law
42 40 Bell Boulevard, Suite 302
Bayside, New York 11361

Office (718) 279 4500
Facsimile (718) 281 0850

Email: stevezissou@verizon.net

**BY ECF**

July 11, 2014

Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   *United States v. Asaro, et al.*
      Criminal # 14 Cr 26 (ARR)

Dear Judge Ross:

For the reasons set forth below, I write in support of an application to preclude the government from reading email correspondence between my client and his counsel.

### Background

On or about June 9, 2014, members of the Eastern District Bar received notice from Magistrate Judge Cheryl L. Pollak, that the United States Attorney's Office for the Eastern District of New York was taking the position that communications between counsel and their clients over the prison email system known as "Trulincs," are not privileged. After receiving this notice, at a status conference in this case held on June 11, 2014, government counsel confirmed that the prosecution team intended to read my communications with Mr. DiFiore over Trulincs. At the request of counsel for the defendant, the government agreed not to review the attorney/client emails until the issues had been fully briefed. This letter/motion follows.

8



## Current Limitations On The Unfettered Right To Counsel

### A. The Protective Order

On or about January 28, 2014, at the request of the government, Your Honor signed a protective order which precludes the defendants from obtaining copies of the consensual recordings in this matter for their own personal review and inspection. Rather, under the terms of the order, counsel for the defendants may review the Protected Materials with the defendants but may not permit the defendants to retain them. Among other things, the government claimed that the protective order would not cause "prejudice" to any of the defendants charged in the indictment.

### B. The Separation Orders

In addition to the complications posed by the restrictive protective order, on May 9, 2014, at the request of the government, the MDC placed separation orders between all four of the above referenced defendants. There was no incident that prompted the separation orders and indeed three of the defendants had been housed together on the same floor without incident prior to May 9, 2014. The separation orders have severely curtailed both counsels' access to their clients, and the discovery review process resulting in the defendants' inability to prepare for trial and a denial of their due process rights.

A separation order at the MDC implicates more than housing. A separation order dictates that the defendants can never be on the same floor together unless they are at a prearranged co-defendant meeting where counsel is present. Accordingly, if one of the defendants is on a legal or social visit, another attorney cannot visit their client.

### C. [redacted]

[redacted]

## Argument

Regardless of whether such communications qualify for protection under the attorney-client privilege, the government's decision to read our communications with our client is entirely inappropriate. As explained herein, the government's decision will frustrate Mr. DiFiore's access to counsel and, given the unique circumstances of this case and the terms and conditions of his confinement, will violate Mr. DiFiore's right to due process and the effective assistance of counsel. Thus, we respectfully request that the Court order the government to segregate and not review all correspondence between Mr. DiFiore and his attorneys of record in this action sent over Trulincs.

It is well-settled that federal courts have broad powers to control their proceedings, including over matters related to discovery. See *Chambers v. NASCO*, Inc., 501 U.S. 32, 43 (1991) (Federal court's inherent powers arise from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.") (citation omitted); *United States v. Suchakov*, 812 F. Supp. 2d 198, 206 (E.D.N.Y. 2011) (noting that federal courts have "broad discretion" to "fashion[] appropriate remedies in both civil and criminal matters."); *United States v. Taylor*, 25 F.R.D. 225, 228 (E.D.N.Y. 1960) (court retains inherent power relating to matters of discovery); see also *Geders v. United States*, 425 U.S. 80, 86 (1976) ("Our cases have consistently recognized the important role the trial judge plays in the federal system of criminal justice . . . . The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process.") (citation omitted). The court's inherent powers are even broader in criminal matters, see *Crawford v. United States*, 212 U.S. 183, 194 (1909), and may be invoked to protect a party's legal rights. See *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) (federal courts have inherent power to expunge criminal records "when necessary to preserve basic legal rights.") (citations omitted).

Here, the government's decision to read all of our communications with Mr. DiFiore over Trulincs frustrates Mr. DiFiore's right to access of counsel. As the Supreme Court has said, "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's

Page 4 of 4

skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (citations omitted). The right of access to counsel is even more crucial now, pre-trial, as this is the "most critical period of the proceedings . . . when consultation, thorough-going investigation and preparation are vitally important[.]" *Massiah v. United States*, 377 U.S. 201, 205 (1964) (internal marks and citation omitted).

This is especially true here given the complexity of this case, Mr. DiFiore's medical issues and the need for him to actively participate with counsel to prepare his defense. Since the initial appearance in this case, the government has produced to counsel thousands of pages of discovery and hundreds of hours of audio recordings. The most recent discovery, made available on June 19, 2014, consists of the following: pen register data, historical cell site data, analysis of two Samsung phones, analysis of one iPhone 4S, surveillance photographs, property records and domicile documents

While in person visits will, of course, be necessary, it is considerably more cost-effective and efficient for us to communicate with Mr. DiFiore via Trulincs than to expend significant time traveling to and from the MDC or seeking approval for an unmonitored telephone call each time we need to speak with him about his case. And, of course, his medical issues make it imperative that we have the unfettered ability to communicate with him on a hourly basis so that we can ensure that he is receiving the "stellar" medical care that the government has represented is being provided by the Bureau of Prisons.

For the reasons set forth above, we respectfully request that the Court order the government to segregate and not review any emails sent between Mr. DiFiore and his attorneys of record in this action via the Trulincs system.

Thank you very much for your consideration in this matter.

Respectfully submitted,

*Steve Zissou*

Steve Zissou
Sally J.M. Butler
Attorneys for Defendant
Thomas DiFiore

cc: all parties by ecf

11